## NATIONAL LABOR RELATIONS BOARD v. STACKPOLE CARBON CO.
### No. 6830.

Circuit Court of Appeals, Third Circuit.
May 12, 1939.

As Amended June 2, 1939.

Rehearing Denied June 30, 1939.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp, Robert S. Erdahl, and David McCalmont, Jr., Attys., all of Washington, D. C., for National Labor Relations Board.

Clyde A. Armstrong, John E. Laughlin, Jr., and Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., and Herbert P. Sarg, of St. Marys, Pa., for respondent.

Before DAVIS, BIGGS, and CLARK, Circuit Judges.

BIGGS, Circuit Judge.

In the case at bar a petition was filed by the National Labor Relations Board pursuant to the authority of the National Labor Relations Act, 49 Stat. 449, c. 372, 29 U. S.C. § 151 et seq., 29 U.S.C.A. § 151 et seq., praying this court to enforce an order entered by the Board upon March 25, 1928, against Stackpole Carbon Company, the respondent.

The order[1] as entered by the Board requires the respondent and its agents to (1) cease and desist from (a) restraining or coercing its employees from exercising their rights of self-organization or of collective bargaining by representatives of their own choosing or engaging in activities for the purposes of collective bargaining, (b) from dominating or interfering with the administration of a labor organization known as the Stackpole Employees' Association of St. Mary's, Pennsylvania, or with the administration of any other labor organization formed by the respondent's employees, (c) from giving effect to a certain contract hereafter referred to more specifically between the respondent and the Stackpole Employees' Association of St. Mary's, and (d) from refusing to bargain collectively with United Electrical and Radio Workers of America, Local No. 502, as the exclusive representative of the production and maintenance employees of the respondent's plants at St. Mary's and Johnsonburg, Pennsylvania.

The order of the Board also requires, by way of affirmative action upon the part of the respondent, (2) that the respondent (a) withdraw all recognition from Stackpole Employees' Association of St. Mary's, Pennsylvania, as a representative of its employees for the purposes of collective bargaining, (b) upon request, to bargain collectively with United Electrical and Radio Workers of America, Local No. 502, as the exclusive representative of its employees in the departments of the respondent's plant heretofore designated, (c) upon application, offer to its .employees who were employed on March 2, 1937, and who struck on March 3, 1937, or thereafter, immediate and full reinstatement to their former positions without prejudice to their rights or privileges, dismissing if necessary persons hired to take the places of striking employees, (d) make whole from monetary loss those employees who struck, by paying to them sums equal to

---

[1] The order referred to is set out in full in the appendix attached to this opinion.

the wages they would have earned for the period between the refusal of their applications for reinstatement and the date of their actual reinstatements, less any sums which they may have earned in the interim, and (e) (f) and (g) post notices for a period of thirty consecutive days stating the respondent's willingness to comply and compliance with the order of the Board, and notify the regional director of the Board of the steps taken by the respondent to comply with the order of the Board.

After argument had in the cause before this court and after the respondent had set forth detailed contentions in its brief in respect to the invalidity of the designation by the Board of United Electrical and Radio Workers of America, Local No. 502, as an appropriate agent for collective bargaining on behalf of a majority of the employees of the respondent entitled to be represented, the Board rechecked the evidence and data before it, and as a result thereof found that Local No. 502 did not represent a majority of the employees referred to. The Board through its counsel thereupon consented to a modification of its order of March 25, 1938, by striking therefrom paragraphs (1) (d), (2) (b) and the reference to paragraph (1) (d) appearing in paragraph (2) (e).

The question presented for our determination therefore is whether or not the order of the Board as modified should be enforced, should be subjected to further modification or should be refused enforcement. In order that the issues presented by this question may be made clear we deem it necessary to give as brief a resumé as we can of the pertinent facts.

The hearings before the trial examiner consumed many days and certain issues were presented for determination of the Board which are not now pertinent. We think that it is sufficient to state the following. The respondent is a Pennsylvania corporation, operating plants at St. Mary's and Johnsonburg, Pennsylvania, for the manufacture and sale of carbon products and radio parts. It clearly appears that approximately two-thirds of the raw materials purchased by the respondent come from without the State of Pennsylvania and over 50 per cent. of its manufactured products are sold to individuals, firms or corporations without that State. It is stipulated and it also appears from the testimony that the respondent is the second, or possibly the third, largest manufacturer of carbon products in the United States, and is a large producer and vendor of radio parts sold throughout this country. The business of the respondent constitutes approximately 10 per cent. of the total carbon products business and approximately 15 per cent. of the radio parts business in the United States. We therefore conclude that the respondent is subject to the provisions of the National Labor Relations Act since the cessation of its business as a manufacturer and seller of carbon products and radio parts has an appreciable effect upon interstate commerce within the meaning of subsection (7) of Section 2 of the National Labor Relations Act, 29 U.S.C.A. § 152 (7). See National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Fruehauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 630, 81 L.Ed. 918, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A. L.R. 1352; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954.

It appears from the record that in August, 1933, the respondent sponsored the formation of a labor organization among its employees which became known as the N. R. A. Union. A meeting of the employees of the respondent was held in August, 1933, upon the premises of the respondent at St. Mary's in order that this union might be organized. Certain supervisory employees of the respondent were put in charge of its affairs. The N. R. A. Union never functioned, however, after its organization.

Approximately three years later an organizer for the United Electrical and Radio Workers of America came to St. Mary's and held a meeting among the employees of the respondent to the end that a local of the United Electrical and Radio Workers of America might be formed. Temporary officers were elected for the local union and a charter for it was obtained from the national organization. The local was designated as No. 502. Immediately thereafter certain of the elected officers of Local No. 502, employees of the respondent, were called to the directors' room of the respondent where they were met by the respondent's president, Harry D. Stackpole, who, according to the statements of the employees, issued a warning to them " * * * to be careful of what kind of an association or union you tie

up with * * *". Mr. Stackpole is further reported to have stated that he would gladly let his employees start a company union and would negotiate with it. According to the testimony of the respondent's employees, Stackpole also stated, "If you boys won't set up a company union I will—in fact I have already set it up." Stackpole denied making such a statement, however, or any statement of a similar tenor.

It is apparent none the less that the respondent immediately after the organization of Local No. 502 began through the medium of its officers and supervisory employees to create and set up the Stackpole Employees' Association of St. Mary's, Pennsylvania. The Board found that this organization was in fact an outgrowth of the old N. R. A. Union. The respondent for its part contends that the Stackpole Employees' Association was largely the outgrowth of a spontaneous movement which started among its employees because they desired such representation for the purpose of collective bargaining. The respondent also contends that the Employees' Association was not sponsored or materially aided by the respondent. These contentions are not borne out by the evidence and the findings of the Board that the Employees' Association was dominated and interfered with by the respondent which contributed financial and other support to it are bottomed upon ample and convincing evidence.

The policy adopted by the respondent in respect to the Employees' Association and Local No. 502 is shown clearly by testimony concerning certain incidents which occurred during the drives for memberships of these two organizations. For example, one foreman instructed an employee in his department to canvass his fellows to try to get them to join the Employees' Association. One female employee who had not become a member of either union was called to the office of the assistant works manager who theretofore had aided her in gaining employment with the respondent. The record shows that she emerged in tears from the office and forthwith joined the Association. These instances might be multiplied from the testimony. The record shows that the respondent practiced unfair labor practices as defined by Section 8 (1, 2) of the Act (29 U.S.C.A. § 158 (1) and (2) in that the respondent interfered with the right of its employees to self-organization and to bargain collectively through representatives of their own choosing. See Section 7 of the Act, 29 U. S.C.A. § 157.

Upon January 4, 1937, representatives of Local No. 502 held a meeting with certain of the officers of the respondent, including President Stackpole, and presented a contract which was designed to be signed by the respondent and by the representatives of Local No. 502 on behalf of the employees. The proposed contract is not printed in the record but from the intermediate report filed by the examiner its terms apparently dealt with wages, hours and working conditions of employees and provided also, it would seem, for exclusive representation by the Local for the purposes of collective bargaining of all of the respondent's eligible employees. The members of the union represented at this time, as they had theretofore, that Local No. 502 had enrolled in its membership a majority of the employees of the respondent eligible for representation. This statement was incorrect. The respondent contends that these statements made by the representatives of Local No. 502 were known by them to be untrue and that these persons made false representations to the end that Local No. 502 might gain advantage thereby. We have examined the record carefully in an attempt to ascertain whether or not this charge made by the respondent is justified by the evidence and we think that it may be said that a careful examination of the facts by the representatives of Local No. 502 should have convinced them that the union on whose behalf they appeared did not represent a majority of the employees of the respondent eligible for representation.

At this meeting the president of the respondent requested that a grace period of thirty days be given to the respondent in order that he might consider the demands made. Thereupon the representatives of Local No. 502 stated that the union was willing to accord a period of a week to the respondent in order that its officers might ascertain whether or not they desired to accept the terms proposed by the contract.

Thereafter, upon January 9, 1937, the contract committee of the Employees' Association called upon the general manager of the respondent's plant and informed him that the Association represented a majority of the respondent's employees. This was followed immediately by a meeting held upon Sunday, January 10, 1937, between

the contract committee of the Association and executive officers of the respondent.

This meeting commenced about eleven o'clock on Sunday morning, continuing without interruption until evening when an agreement was reached. It was agreed, among other things, that the employees of the respondent should receive an increase of 10 per cent. in wages. Upon the following morning, however, the question of the amount and manner of the wage increase again came to the fore and the original agreement was modified to allow an increase of 5¢ an hour to all non-salaried employees. A contract was thereupon executed between the respondent and the Association. Under the terms of this contract the Association was recognized as a bargaining agent, but not the exclusive bargaining agent, for the employees of the respondent. The agreement also provided for an open shop, for a maximum fifty hour week, for the creation of an arbitration committee to dispose of disputes between the respondent and its employees and for certain other things which need not be discussed here. When the contract was signed an affidavit was obtained by officers of the respondent from two members of the contract committee to the effect that the Association represented a majority of the employees of the respondent eligible for representation.

Thereafter, upon January 11, 1937, one week after the meeting of January 4th, when the committee of Local No. 502 appeared at the executive offices of the respondent for the answer to their demands theretofore made, they were given a written statement prepared and signed by the president of the respondent which stated that the respondent had recognized " * * * the Employees' Association as the duly constituted representative of the employees." The demands of Local No. 502 were then refused.

As we have stated, subparagraph (c) of the order of the Board provides that the respondent shall cease giving effect to this contract. We have already stated our conclusion that the Employees' Association was dominated by the respondent. The petitioner contends that this portion of its order is as necessary for the establishment of fair labor relations between the respondent and its employees as contemplated by the Act as is the disestablishment of the Association as a company union; that the execution of the contract of January 10th between the Association and the respondent was the culminating objective of respondent's coercion directed against its employees to the end that they might not freely exercise their right of collective bargaining through representatives of their own choosing as guaranteed by the Act.

We deem it appropriate at this point of our opinion to set forth our ruling upon this question. In the case of Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 218, 83 L.Ed. 126, the Supreme Court had before it the question of whether or not certain provisions of an order of the National Labor Relations Board requiring the respondent, Consolidated Edison Company, to desist from giving effect to certain contracts entered into between the respondent and the International Brotherhood of Electrical Workers, were valid and should be enforced. The Chief Justice delivering the opinion of the Court, stated: "We approach them [the Brotherhood contracts] in the light of three cardinal considerations. One is that the Brotherhood and its locals are labor organizations independently established as affiliates of the American Federation of Labor and are not under the control of the employing companies. So far as there was any charge, under Section 8(2) of the Act, that the employing companies had dominated or interfered with the formation or administration of any labor organization or had contributed financial or other support to it, the charge was dismissed." The Chief Justice then went on to say that the two other cardinal considerations which moved the Supreme Court to its decision upon this point were the facts that the Brotherhood contracts recognized the right of employees to bargain collectively and that the Brotherhood agreed for itself and its members not to intimidate or coerce employees or solicit memberships on the time or property of the employers, and that the contracts contained provisions dealing with working conditions, wages, hours and arbitration of disputes, " * * * constituting insurance against the disruption of the service of the companies to interstate or foreign commerce through an outbreak of industrial strife." The Chief Justice also distinguished the facts of the Consolidated Edison case from those of the case of National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R.

307, stating in respect to the latter case "* * * that the employer had created and fostered the labor organization in question and dominated its administration in violation of Section 8(2)." The Chief Justice then stated:

"* * * the Act gives no express authority to the Board to invalidate contracts with independent labor organizations. That authority, if it exists, must rest upon the provisions of Section 10(c). That section authorizes the Board, when it has found the employer guilty of unfair labor practices, to require him to desist from such practices 'and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act * * *'. We think that this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order.

"The power to command affirmative action is remedial, not punitive, and is to be exercised in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act. The continued existence of a company union established by unfair labor practices or of a union dominated by the employer is a consequence or violation of the Act whose continuance thwarts the purposes of the Act and renders ineffective any order restraining the unfair practices. Compare National Labor Relations Board v. Pennsylvania Greyhound Lines, supra. Here, there is no basis for a finding that the contracts with the Brotherhood and its locals were a consequence of the unfair labor practices found by the Board or that these contracts in themselves thwart any policy of the Act or that their cancellation would in any way make the order to cease the specified practices any more effective." The Chief Justice thereupon concluded that the Board was without authority to require the petitioning companies to desist from giving effect to the Brotherhood contracts as provided in the Board's order.

■ While the complaint filed against the respondent with the Board in the case at bar makes no specific reference to the contract of January 10, 1937, entered into between the respondent and the Association as an unfair labor practice, none the less paragraph 6 of the complaint states that the respondent "* * * recognizes and continues to recognize the 'Stackpole Employees' Association of St. Mary's, Pennsylvania', as the exclusive bargaining agency and that all grievances would be discussed with said Association in spite of the fact that the formation and administration of said 'Stackpole Employees' Association of St. Mary's, Pennsylvania,' is in violation of the National Labor Relations Act, as hereinafter set forth." Paragraphs 7 and 8 of the complaint in substance reiterate these charges and in our opinion the execution of the contract referred to between the respondent and the company-dominated Association was an unfair labor practice within the broad language of the complaint. We state in this connection that in our opinion the respondent rushed to the contract with the Association to the end that it might avoid the necessity of negotiations with its employees except through the medium of a union which it dominated. Nor do we deem that any question of lack of notice to the Association may arise in the case at bar since the Employees' Association, a company union, is within the ruling of the Supreme Court in National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., supra, 303 U.S. at page 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

■ At least two of the three cardinal considerations found by the Supreme Court to be present in the Consolidated Edison case, specifically, the independence of the unions and the element of insurance against future industrial strife, are absent from the circumstances of the case at bar. The Employees' Association in the case at bar is a company union, largely created and certainly dominated by the respondent. It follows therefore that the contract of January 10, 1937, was not made by the respondent with an independent organization qualified to represent employees. We conclude that the Board in ordering the respondent to cease giving effect to the contract is within the authority conferred upon it by the provisions of Section 10(c) of the Act, 11 U.S.C.A. § 160(c). The portion of the Board's order referred to is remedial and not punitive. This section of the order was necessary in order to insure to the employees of the respondent

their rights of self-organization and of collective bargaining, and to effectuate in general the policies of the Act, and was sanctioned by the decision of the Supreme Court in the case of National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., supra. See also National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138; United States v. Reading Co., 226 U.S. 324, 33 S.Ct. 90, 57 L.Ed. 243.

Moreover, the execution of the contract between the Association and the respondent did nothing to bring harmony to the respondent and its employees. The parties could hardly have expected it to do so. The execution of the contract increased the bitterness of feeling between the parties to the controversy. It was executed in the very teeth of the Act and with a company-dominated union. We are therefore of the opinion that the Board committed no error in making this portion of its order.

We must now state the facts which led to the strike of some of the respondent's employees. The permanent organization of the Association proceeded rapidly under the promotion of the respondent. The constitution and by-laws of the Association were printed at the expense of the respondent and distributed among its employees. The respondent treated the Association as the exclusive bargaining agent for its employees though the contract of January 10, 1937 did not confer such a status upon the Association. Attempts were made as before by supervisory employees of the respondent to influence members of Local No. 502 to withdraw their support from that organization. When dues began to be collected by the Association in February, 1937, President Stackpole himself stated that he would give a dollar to the Association for every dollar collected by it by way of dues. This offer was subsequently withdrawn, however. Certain employees of the respondent who distributed circulars for the Association received extra pay from the respondent for the time spent by them in making these distributions. The numerous acts performed by the respondent throughout the period following the execution of the contract of January 10, 1937, to aid the Association need not be detailed here. They were almost continuous and of a kind designed to help the Association and hurt the Local. Threats of removal of the industry from St. Mary's were frequently made by responsible officers of the respondent and reiterated in the local press. The volume-control department of the respondent in fact was moved to Johnsonburg in the latter part of February, 1937. Meetings of the Association were held in the respondent's plant, while employees in sympathy with the Local were laid off or otherwise discriminated against. The record shows clearly that every effort was made by the respondent to strengthen the Association while destroying the opposition union.

At a meeting of Local No. 502 held upon the night of February 25, 1937, a strike resolution was offered and carried. This resolution provided for a strike upon March 2, 1937 unless the respondent would meet with representatives of the Union for the purposes of collective bargaining, and a letter to such effect was sent by the Union to the president of the respondent. About this time, Kleeb, an attorney for the Regional Board of the National Labor Relations Board, came to St. Mary's and urged that the strike be avoided by holding an election among the respondent's employees in order to determine what organization should represent the employees. Pending the success or failure of Kleeb's efforts, Local No. 502 deferred the calling of the strike for a period of twenty-four hours. A meeting between the officers of the respondent and of the Local was called and a contract was presented by Kleeb by which the conduct of the proposed election was to be governed. An officer of the Local testified that at this meeting most, if not all, of the points in dispute in respect to the election, were agreed to. A meeting of the Local was held upon the evening of March 2, 1937, and at this time the proposed agreement was approved fully by the Local. The president of the respondent, however, refused to enter into this contract unless the consent of the Association was obtained to it. As a practical matter this constituted a rejection of the contract by the respondent. It should be pointed out, however, that no election was ever ordered by the National Labor Relations Board, and that neither the charge to the Board nor the complaint was filed until after the occurrence of the events heretofore referred to.

Following the rejection of the contract for an election, the strike took place upon March 3, 1937. The plant of the respondent was picketed and some violence followed. Upon March 6, 1937, a meeting of

the members of the Association was held at the respondent's plant. At the close of this meeting the non-striking employees of the respondent issued from the plant en masse. In this connection the Board stated in its opinion, " * * * some of the 'loyal' workers, apparently those who had attended the meeting of the Association, rushed out of the plant without punching their time cards." A fist-fight ensued and several persons were injured. No arrests were made at this time, though members of the Pennsylvania State Constabulary were present. Later, however, about twenty members of Local No. 502 were charged with assault and battery, disorderly conduct, disturbing the peace and with causing damage to the property of non-striking employees. One of the strikers was sentenced to jail for a period of four months. Another was given a sentence of thirty days. The rest were held in substantial bail. At least five persons who were not members of the Local were also charged with disorderly conduct or assault and battery. These persons were held in comparatively low bail by the committing magistrate. The record does not disclose the final disposition of these cases. One serious charge was made. Jesberger, a trustee for Local No. 502, was charged with using explosives with intent to do bodily harm in connection with an explosion which took place upon the porch of the home of an officer of the Association. The amount of damage caused by the explosion was approximately $30. Counsel for the Board state that the charge against Jesberger was nolle prossed in January, 1938, and the truth of this statement is not denied by counsel for the respondent.

All of the employees of the respondent who went on strike received checks marked "Paid in full to date" from the respondent at various times within the week commencing upon Thursday, March 4, 1937. These checks covered the period of last services performed by them for the respondent. It appears from the record that 131 employees of the respondent received such checks and that none of them have been re-employed, though new employees to the number of 145 have been employed by the respondent at its plants at St. Mary's and Johnsonburg, Pennsylvania.

In respect to the strike the Board stated: "It is clear that the employees of the respondent who struck on March 3, 1937, did so as a direct result of the respondent's unfair labor practices. The evidence establishes that the members of Local No. 502 voted to strike because of the respondent's refusal to bargain collectively and its interference with the Association, as well as its refusal to consent to an election without the approval of the Association."

■ Subsection (a) of Section 9 of the Act, 29 U.S.C.A. § 159(a) states that "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining * * *". Local No. 502 did not in fact represent a majority of the employees of the respondent eligible for representation and the Board concedes this fact. Nor can it be said that the refusal of the respondent to agree to an election was an unfair labor practice, for the Board had not ordered an election to be held. None the less it is a fact that the respondent did interfere with the organization and management of the Association and did constitute it as a company union, unable to represent the employees of the respondent within the meaning of the Act. The incident which immediately brought on the strike was the refusal of the respondent to agree to the holding of an election and we entertain little doubt that if an election had been held the strike would have been postponed, but the fundamental causes of the strike went far deeper. The continued promotion of the Association by the respondent and its refusal to treat in any way with the independent union were contributing causes as was the respondent's refusal to bargain collectively with Local No. 502. In the letter of February 26, 1937, sent to President Stackpole by Local No. 502, it is stated that there would be a cessation of work at the St. Mary's plant unless the respondent agreed to bargain collectively with the union, and it is made clear in the letter that the members of the Local considered the strike a practical necessity because the respondent had set up a company-dominated union. The Board has found as a fact that interference with and domination of the Association by the respondent was at least one cause of the strike. In our opinion this finding is supported by sufficient evidence and it appears clearly that the respondent was guilty of unfair labor practices prohibited by Section 8(1) and (2) of the Act, 29 U.S.C.A. § 158(1) and (2).

176

■ If, as we believe to be the case, the strike came to pass for the three reasons stated in the Board's opinion and which we have set out in the last sentence of the last paragraph quoted above save one, one of those reasons, viz., the interference by the respondent with the right of its employees to self-organization as provided by Section 7 of the Act, 29 U.S.C.A. § 157, was a tort, a " 'substraction' ", to employ the language of the Circuit Court of Appeals for the Second Circuit in the case of National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 872, certiorari denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540, and as stated in the opinion in the cited case " * * * it rested upon the tortfeasor to disentangle the consequences for which it was chargeable from those from which it was immune." In short, the burden rested upon the respondent to show that the strike would have taken place even if it had not interfered with the right of its employees to self-organization in contravention of the provisions of the Act. This the respondent has not done and this we believe it cannot do.

■ Moreover, we think that it cannot be denied that the strike was a consequence of a current labor dispute as defined in Section 2(9) of the Act, 29 U.S.C.A. § 152 (9). Section 2(3) of the Act, 29 U.S.C.A. § 152(3), defines the term "employee" as " * * * any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice * * *". In National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381, the Supreme Court held that under the definition of the Act just quoted strikers remain employees for the purposes of the Act. Moreover, it is clear that the respondent attempted to terminate the employee status of its striking employees simply because they went on strike. Section 13 of the Act, 29 U.S.C.A. § 163, preserves to employees the right to strike. This includes a right to strike by reason of an unfair labor practice upon the part of the employer as well as for other causes. National Labor Relations Board v. Remington Rand, Inc., supra, page 871. As a matter of fact in the case at bar the Board found that the strikers were never discharged by the respondent. Indeed formal discharges were not given by the respond-

ent to its striking employees. As we have stated, the respondent sent checks to them marked "Paid in full to date" and other employees were hired to take the places of the strikers. In our opinion the status of the strikers as employees of the respondent was not terminated by the strike and has remained unchanged unless it be by reason of the conduct of the strikers in engaging in an altercation with the non-striking employees of the respondent upon the picket line.

■ The nature of this altercation has already been stated in some detail. We think that it was not of such a type or character as to bring the status of the striking employees within the ruling of the Supreme Court in the case of National Labor Relations Board v. Fansteel Metallurgical Corporation, 59 S.Ct. 490, 83 L.Ed. 627, opinion filed February 27, 1939.

If the circumstances of the case at bar be contrasted with those of the Fansteel case substantial differences are apparent at once. First, in the case at bar there was no sit-down strike. The plant remained fully in the possession of the respondent and its authorized officers. Production continued. The altercation between strikers and non-strikers took place outside the plant. It amounted to little more than a fist-fight in which both sides joined with equal willingness. There is no evidence whatsoever that this fight was part of a plan upon the part of the respondent's striking employees to force compliance with their demands. As a matter of fact the Board found that the fight was started by non-striking employees as they emerged from the plant and there is substantial evidence to support this conclusion. We cannot conclude that rights given to employees under the National Labor Relations Act are destroyed because of violence of a type as common to labor disputes as a fist-fight upon a picket line. In brief, in our opinion there was no act of "compulsion" upon the part of the strikers whereby " * * * they took a position outside of the protection of the statute and accepted the risk of the termination of their employment * * *" within the language of the Fansteel Corporation case [59 S.Ct. 496].

The damaging of the porch of the home of a supervisory employee of the respondent by the use of explosives is of a serious nature, but there is no evidence in these proceedings bringing such violence home

to members of Local No. 502 or to anyone connected with them.

We therefore conclude that paragraph 2(c) of the Board's order should be enforced and that the respondent upon application must offer to such of its employees who were employed on March 2, 1937 and who struck on March 3, 1937 or thereafter, immediate and full reinstatement to their former positions without prejudice to their rights and privileges.

In regard to paragraph 2(d) of the order of the Board which requires the respondent to make whole from monetary loss those employees who went on strike, by paying them sums equal to the wages they would have earned for the period beginning with the dates of their respective applications for reinstatement to the dates of such actual reinstatement, less any sums which they may have earned in the interim, in view of what we have already said we can perceive no reason why this section of the order of the Board should be deemed to be outside of the scope of its authority or unsupported by the record in the case at bar.

In respect to the intervention of Workers' Security Union, allowed by this court upon October 3, 1938, we conclude that the enforcement of the Board's order to the extent hereafter indicated cannot result in prejudice or harm to the intervenor. The questions of fact raised by the intervention can be determined only by the Board upon application to it, this court being without power to act as a fact finding tribunal. The issues presented by the petition are therefore not justiciable before us. Indeed they relate to events alleged to have occurred subsequent to the time of the findings and order of the Board and therefore have no place in the present proceedings. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., supra, 303 U.S. page 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, and National Labor Relations Board v. Remington Rand, Inc., supra, page 870.

The respondent contends that the conduct of the hearings by the trial examiner was unfair. It states that upon occasion the examiner himself subjected witnesses to searching cross-examination. This is a right of which judges avail themselves frequently and is a proper exercise of the judicial prerogative. We cannot find that these actions of the examiner in anywise limited the right to the respondent to bring forth its side of the case. The respondent asserts that the examiner refused to permit the respondent to object to questions asked by him of its witnesses. We can find no instance in which the respondent failed to make its objections known or failed to make such objections plain upon the record. Certain of the questions asked by the trial examiner were not helpful in eliciting the information and upon occasion were tinged with a sarcasm not appropriate to a judicial officer. The cause of the respondent, however, was not prejudiced by these questions, and the conduct of the hearings was fair. We can perceive nothing in the record to sustain a conclusion that the attitude of the examiner in any wise militated against the respondent's presentation of its evidence or its cross-examination of the Board's witnesses. The respondent also contends that the decision of the Board and its order were invalid by reason of manifest bias and prejudice against the respondent. Certain of the conclusions of the Board, those relating to the alleged majority representation of the respondent's eligible employees by Local No. 502, were not supported by the evidence and have now been abandoned by the Board. The respondent contends in substance that because of this error the Board has demonstrated bias. To find bias in a judicial tribunal because it has committed error of this kind would destroy the usefulness of the judicial process. We cannot perceive that the Board failed to weigh the evidence, and its order, other than as we have indicated, finds full justification in the record.

As to those sections of the Board's order to which we have not specifically adverted heretofore, we state that they are supported by the record, are within the powers conferred upon the Board by the Act, and must be given effect.

Accordingly the order of the Board will be enforced except that we strike therefrom paragraphs 1(d), 2(b) and the reference to paragraph 1(d) appearing in paragraph 2(e).

## APPENDIX.

### Order of the National Labor Relations Board.

Upon the basis of the findings of fact and conclusions of law and pursuant to Section 10(c) of the National Labor Relations Act, the National Labor Relations

Board hereby orders that the respondent, Stackpole Carbon Company, St. Marys, Pennsylvania, and its officers, agents, successors, and assigns shall:

1. Cease and desist:

(a) From in any manner interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, or to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act.

(b) From in any manner dominating or interfering with the administration of the Stackpole Employees' Association of St. Marys, Pennsylvania, or with the formation or administration of any other labor organization of its employees, and from contributing financial or other support to Stackpole Employees' Association of St. Marys, Pennsylvania, or any other labor organization of its employees.

(c) From giving effect to its contract with the Association.

(d) From refusing to bargain collectively with United Electrical & Radio Workers of America, Local No. 502, as the exclusive representative of the production and maintenance employees at its St. Marys, Pennsylvania, plant and its Johnsonburg, Pennsylvania, plant, except clerical, supervisory, and "temporary" employees and except employees in its accounting, sales, cost, purchasing, drafting, engineering and machine shop departments, and except watchmen.

2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Withdraw all recognition from Stackpole Employees' Association of St. Marys, Pennsylvania, as a representative of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work; and completely disestablish said Association as such representative.

(b) Upon request, bargain collectively with the United Electrical & Radio Workers of America, Local No. 502, as the exclusive representative of the production and maintenance employees at its St. Marys, Pennsylvania, plant and its Johnsonburg, Pennsylvania, plant, except clerical, supervisory, and "temporary" employees and except employees in its accounting, sales, cost, purchasing, drafting, engineering, and machine shop departments, and except watchmen, in respect to rates of pay, wages, hours of employment, or other conditions of employment.

(c) Upon application, offer to its employees who were employed on March 2, 1937, and who struck on March 3, 1937, or thereafter, immediate and full reinstatement to their former positions at either its St. Marys, Pennsylvania, plant or its Johnsonburg, Pennsylvania, plant, without prejudice to their seniority and other rights and privileges, dismissing if necessary, persons hired on or after March 3, 1937.

(d) Make whole all employees who went on strike on March 3, 1937, and thereafter, for any losses they may suffer by reason of any refusal of their application for reinstatement in accordance with paragraph 2(c) herein, by payment to each of them respectively, of a sum equal to that which each would normally have earned as wages during the period from the date of any such refusal of their application to the date of reinstatement, less the amount, if any, which each, respectively, earned during said period.

(e) Post immediately notices to its employees in conspicuous places throughout its plant, stating: (1) that the respondent will cease and desist as provided in paragraphs 1(a), (b), (c) and (d) of this Order; (2) that the respondent withdraws and will refrain from all recognition of Stackpole Employees' Association of St. Marys, Pennsylvania, as a representative of its employees, and completely disestablishes it as such representative; (3) that the agreement signed with Stackpole Employees' Association of St. Marys, Pennsylvania, is void and of no effect.

(f) Maintain such notices for at least thirty (30) consecutive days from the date of posting; and

(g) Notify the Regional Director for the Sixth Region in writing within ten (10) days from the date of this order what steps the respondent has taken to comply herewith.

And it is further ordered that the allegation in the complaint that the respondent has engaged in an unfair labor practice within the meaning of Section 8(3) of the Act, by discharging its employees who struck on March 3, 1937, be, and it hereby is, dismissed.

On Petition for Rehearing.

PER CURIAM.

The respondent, following our decision of May 12, 1939, filed a petition for rehearing upon several grounds. One of these requires brief discussion. Following receipt of the order of the Board the respondent filed with the Regional Director of the Sixth Region of the National Labor Relations Board, at Pittsburgh, a certificate of partial compliance with the decision and order of the Board. This certificate stated that the respondent would comply with the Board's order requiring it to cease from dominating the Stackpole Employees' Association of St. Mary's, from interfering with the formation or administration of any labor organization among the respondent's employees, and that the respondent had repudiated the contract of January 10, 1937, and was withdrawing all recognition from Stackpole Employees' Association. We did not refer to these facts in our opinion of May 12, 1939.

We did not consider the certificate of great importance in view of the fact that the issues to which the certificate related were presented to us for adjudication, the certificate itself stating, "This notification of compliance is, of course, without prejudice to the rights set forth above and shall not be construed as a waiver of any of our objections and exceptions to the proceedings * * *".

We have considered carefully the matters presented by the petition for rehearing and consider them to be insufficient to require a rehearing of the cause.

Accordingly, rehearing is denied.