**SUBIN et al. (MINNUCCI et al., Interveners), v. NATIONAL LABOR RELATIONS BOARD.**

**No. 7092.**

Circuit Court of Appeals, Third Circuit.

March 12, 1940.

Rehearing Denied May 7, 1940.

Charles J. Weiss, of Philadelphia, Pa., Wessel, Bennett & Weiss, for Subin and others.

Thomas F. Gain, of Philadelphia, Pa., for Minnucci and others.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Lawrence A. Knapp, Asst. Gen. Counsel, Mortimer B. Wolfe, Bertram Edises, Leonard Appel, and Ramey Donovan, Attys., National Labor Relations Board, all of Washington, D. C., for respondent.

Before BIGGS, CLARK and JONES, Circuit Judges.

BIGGS, Circuit Judge.

The Subins, co-partners doing business under the name of Arcadia Hosiery Company, at Lansdale, Pennsylvania, and Leo Minnucci and certain others constituting a Shop Committee of Arcadia's employees, intervenors, have petitioned this court to set aside an order of the National Labor Relations Board entered on April 27, 1939. The order requires the Subins to cease and desist from dominating or contributing support to the Shop Committee or to any other labor organization of their employees, from discouraging membership in American Federation of Hosiery Workers, Branch No. 67, referred to hereafter as the "Union", or in any other labor organization of their employees by refusing to reinstate any of their employees or by discriminating in regard to their hire or tenure of employment, or, from coercing their employees in regard to their rights of self-organization for collective bargaining. The Board's order also requires the Subins to withdraw recognition from the Shop Committee, to disestablish it as a representative of their employees and to offer reinstatement to certain named employees with reimbursement for loss of pay, and to give notice of compliance with the order.

The pertinent facts are as follows: In 1935 the Subins had a plant for the manufacture of hosiery at Pleasantville, New Jersey, as well as at Lansdale, Pennsylvania. In July, 1935, labor trouble developed at the New Jersey plant. Acts of violence took place, causing financial loss to the Subins. Operations continued undisturbed at the Lansdale plant where there was no labor trouble. We think that the Subins' unfavorable attitude in regard to unionization was due in part at least to their experiences at Pleasantville. The Pleasantville plant was closed. The employees of Arcadia at Lansdale were not unionized. In July, 1937, the American Federation of Hosiery Workers, Branch No. 67, attempted to organize these employees. These efforts met with immediate success. In August, 1937, representatives of the Union, including Kellenbenz, a business representative of the American Federation of Hosiery Workers, requested the Subins to sign a contract with the Union for employee representation. David Subin apparently informed Kellenbenz that he and his brother had decided to go out of business and therefore there was no point in meeting with representatives of the Union. Nevertheless a meeting was arranged, and a contract was submitted by Kellenbenz to David Subin. Subin in turn handed to Kellenbenz a notice addressed to the Arcadia employees which stated that the Subins had decided to go out of business and to discontinue the manufacture of full-fashioned hosiery because of the highly competitive condition in that industry. Kellenbenz and others persuaded Subin not to post this notice. The Board, however, found as a fact that Subin stated that he would post it and go out of business if the Union caused him any trouble.

Unionization had proceeded in other hosiery plants in Lansdale and about December 1, 1937, the Union sent a notice to hosiery plants in Lansdale that employees' grievances should be aired through shop committees constituted by the Union. The Union requested that a notice to this effect be posted in the Arcadia plant. The notice was given to Alvin Holsopple, chairman of the Union's Shop Committee at the plant so that he might deliver it to the Subins. A few days later, Weisbecker, Arcadia's superintendent, came to Holsopple and showed him the liquidation notice which we have referred to previously. Holsopple testified that Weisbecker asked

him if he did not regard the liquidation notice as "a better notice" than that relating to the use of the Union's Shop Committee for the airing of grievances which Holsopple had requested be posted upon the plant bulletin board. It should be pointed out, however, that the Subins for their part, contend that they had decided to go out of business because Kellenbenz had threatened them with an "Apex Situation" if Arcadia did not recognize the Union for the purposes of collective bargaining. The Apex Hosiery Company of Philadelphia had suffered substantial damage because of a sit-down strike conducted by a local of the American Federation of Full Fashioned Hosiery Workers in defiance of local law. The Board found that the Subins made use of the liquidation notice to influence their employees " * * * to abstain from or abandon membership in the Hosiery workers * * *" and that the Subins therefore had coerced their employees in the exercise of rights guaranteed to them by Section 7 of the National Labor Relations Act, 49 Stat. 452, 29 U.S. C.A. § 157. It is not necessary for us to pass upon the question of whether or not the Act will serve to prevent an employer from threatening to go out of business in order to influence his employees from joining a union (See the decision of this court in Union Drawn Steel Company and Republic Steel Corporation v. National Labor Relations Board, 3 Cir., 109 F.2d 587) for the conclusion of law of the Board as to unfair labor practices committed by the Subins need not be based upon the finding of fact just referred to. It should be noted, however, that the Subins did not go out of business despite the liquidation notice which was posted upon December 10, 1937, and at the time of the hearings were still engaged in manufacturing hosiery at Lansdale.

The Board also found as a fact that the Shop Committee headed by Minnucci and others was a company-dominated union. In this connection the record shows that in the summer of 1937 while unionization of other hosiery plants in Lansdale was progressing, a notice was posted in the Arcadia plant calling a meeting of the Arcadia employees at a club in Lansdale. The Board found as a fact that the Subins gave their employees permission to remain away from work during this meeting and that about 175 of the Arcadia employees attended it. The creation of a labor or-

ganization was discussed, agreed upon and officers and committeemen were elected. An attorney was employed to prepare the constitution and by-laws of the organization. A meeting of employees was called to ratify the constitution and to adopt the by-laws. This meeting took place on Saturday afternoon while the plant was closed. It was attended by a very few persons. Minnucci testified that he was disturbed by this small attendance and got in touch with David Subin. Within a short time thereafter, Benjamin Subin, Minnucci and other employees attended a meeting at the home of an employee named Fluck. At this meeting Benjamin Subin stated that he and his brother intended to go out of the knitting business and wanted to sell the machines to their employees upon an installment basis. It was then suggested that the plant be organized upon the Nunn-Busch plan. About a week later copies of the Nunn-Busch plan were circulated among the employees. Another meeting of employees was called at Superintendent Weisbecker's brother's home at which Benjamin Subin explained the Nunn-Busch plan and stated that he was interested in it. Other meetings followed between Minnucci, Subin and others and a plan of organization for the Subin employees based upon the Nunn-Busch plan, was drafted. It was submitted to the Subins' attorney, who made no substantial changes but struck out the names of those employees who were to form the Shop Committee which had already been inserted therein. Upon December 23, 1937, a notice was posted in the Arcadia plant with the Subins' permission, which stated that there would be a meeting of the employees at the Lexington Line Tavern on December 24th. Upon the afternoon of December 23, Minnucci got together about thirty-five of the Arcadia employees, calling some of them from their work. David Subin read the Shop Committee plan to this gathering and answered questions about it. He apparently told those present that he and his brother would recognize the Shop Committee when it was chosen. When Subin left the meeting Minnucci took charge of it and presented the names of five men designated as members of the Shop Committee. No objections were made to any of them. Upon the following day approximately 140 of the Arcadia employees met as planned and voted to accept the Shop Committee plan.

■ Under it five designated employees were constituted the bargaining agency for all employees. The plan provided that disputes between the management and the Committee should be settled by arbitration. It provided also that the engaging of employees should be in the control of the management, but before any permanent employee could be discharged, such discharge should be submitted to the Committee for its approval. The plan also contained provisions in respect to hours of work and wages. The Board found that the Subins resisting the Union, "foisted the Shop Committee upon the employees", welcoming its formation as an antidote to the activities of the American Federation of Hosiery Workers; that the Subins interfered with and dominated the formation and administration of the Committee, thereby interfering with and coercing their employees in the exercise of rights of collective bargaining guaranteed by Section 7 of the Labor Act, 49 Stat. 452, 29 U.S.C.A. § 157; and that therefore the Subins were guilty of unfair labor practices as defined by Section 8(1) and (2) of the Act, 49 Stat. 452, 29 U.S.C.A. § 158(1, 2). In our opinion these conclusions of the Board are supported by " * * * · such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713, 721; Titan Metal Mfg. Co. v. National Labor Relations Board, 3 Cir., 106 F.2d 254; National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167.

### As to Those Portions of the Board's Order Requiring Reinstatement With Back Pay of Certain Employees.

■ The Board's order requires certain employees to be reinstated in their positions with back pay, less sums earned in the interim. The cases of Alvin Holsopple and the three Kelso brothers may be treated together. Holsopple had been employed at the Arcadia plant for over three years; the Kelsos for comparable periods of time. All were members of the Union, a fact which was known to Superintendent Weisbecker. All four men had promoted actively the unionization of the Arcadia

plant. Holsopple was the chairman of the Union's Shop Committee, while the Kelso brothers distributed application cards and solicited memberships. Their discharges came about as follows. It was the custom at the Arcadia plant for the employees to clean their machines one day a year on their own time. Weisbecker informed all the employees that this work was to be done on December 31st. Holsopple and the Kelsos did not go to the plant until shortly after noon on that day. Long before their appearance, Weisbecker stated to the Shop Committee · according to his own testimony, "I am going to give them until eleven o'clock. If they are not in I will fire them." At the suggestion of the Shop Committee, however, Weisbecker advanced the dead line of discharge to noon. Formal notices of discharge were prepared in advance. When Holsopple and the Kelsos arrived at the plant at about twelve-thirty o'clock in the afternoon, they were discharged. All four men had been attending· a meeting of the Union that morning, a fact which the Board found was known to Weisbecker.

Holsopple and the Kelsos testified that they were not told to appear at the plant by noon or be discharged. It is clear that it was the custom of the Subins not to pay their employees for the cleaning of their machines at the year's end. Holsopple testified, "All of the time I had been there I had come in at approximately that time [viz., 12:30 P. M.]. I don't know exactly what time it was. It may have been eleven o'clock, or twelve o'clock or one o'clock. I don't know." The testimony of the Kelsos was substantially the same as Holsopple's on this point. Holsopple also testified, "Inasmuch as we had no time set when we should come in to clean our machines, we couldn't understand why we were fired because we happened to get in at 12:30 when we would have had ample time to clean our machines and still get out of the plant early. That was discussed to quite an extent and the reason. We couldn't understand the reason why we were discharged." Holsopple also stated that the only explanation which was given to them by Weisbecker was "It is too late now. I want to close down the plant and get out." Upon consideration of these circumstances, we are of the opinion that the Board's conclusion that the real reason why these four men were discharged was their known membership in and activity

on behalf of the Union, is supported by adequate evidence.

■ As to Bessie Holsopple, the following facts appear. She is the wife of Alvin Holsopple and began working for the Subins in 1935. She had been a member of the American Federation of Hosiery Workers for several years and joined the Union in August, 1937. She was active in soliciting memberships. While at the Arcadia plant she was employed as a "topper". She was shifted to work upon a machine which was about to be sold, a fact which she testified was known generally throughout the plant. When the machine upon which she was working was sold, it was dismantled and taken from the plant. It was necessary therefore either to lay Mrs. Holsopple off or give her some other "topper's" position. Her knitter, Leatherman, was placed upon another machine and continued to work at the Arcadia plant. There were girls working as toppers on the night shift who had been employed for a shorter period of time than Mrs. Holsopple. She was therefore entitled to re-employment upon the basis of seniority. She testified, however, that after the lay-off, she did not try very hard to gain employment elsewhere and did not have "a whole lot of time" because her only child was ill and she was engaged in looking after this child. Upon consideration of all the evidence we are of the opinion that the Board's conclusion that Mrs. Holsopple was laid off and not re-employed because of her union activities is not unreasonable and is supported by adequate evidence. We therefore will order her reinstatement. We conclude, however, that her reinstatement should not be accompanied by back pay because by her own testimony her time following the lay-off was largely occupied by family duties as a matter of her own choice.

■ As to Richard Craner, a topper, it appears that he too was active in soliciting Union memberships. He signed up Superintendent Weisbecker's brother as a member. He testified that he was told at this time that if he was again active on behalf of the Union inside the plant that he would be discharged. About January 7, 1938, his machine was sold, dismantled and taken from the plant. He was then laid off. Craner was senior to toppers who were retained by Arcadia. The record shows, however, that upon his leaving Arcadia he succeeded in getting other employment. He was earning $5.25 a day, or approximately $26.25 a week, when employed by the Subins. While at the Quakertown Hosiery Mills, his subsequent place of employment, he received $21 a week. The Subins contend that Craner never tried to obtain re-employment at their plant and that on one occasion Weisbecker sent for Craner to re-employ him but Craner could not be located. Craner himself testified that when he went to get his pay after his machine was dismantled, one of the office employees told him that he should not return upon the following Monday but that he had never called up the plant or gone back to it in search of re-employment. He testified that immediately after his lay-off he was greeted by Superintendent Weisbecker with the sardonic salutation, "Hello, wise guy." Upon consideration of all of the evidence, we conclude that there was sufficient evidence before the Board to support the conclusion that Craner's services were dispensed with because he had assisted the Union. We do not deem his employment at a lessor rate of pay the equivalent to his employment at Arcadia. We will require his reinstatement as the Board has ordered.

■ As to Jackson, the record shows that he served as vice-chairman of the organizing committee of the Union and played a leading role in its drive for members at the Arcadia plant. His Union membership was known to Weisbecker. He had been employed steadily by the Subins for more than three years. He was laid off on December 17, 1937, because the plant discontinued the manufacture of the style of hosiery upon which he worked. He was re-employed on January 18, 1938. He was dismissed again by Weisbecker on February 2, 1938, with the explanation that his services were not needed because of the completion of the order on which he had been working. Jackson was a "legger". He testified that when he was laid off that Superintendent Weisbecker told him that he would send for him if there was work for him to do. He was not sent for. His machine was dismantled and taken out of the plant. It also appears that Jackson was entitled to employment as a matter of seniority over knitters who were not laid off but whose employment continued without interruption. The Board concluded that Jackson's services were dispensed with by the Subins because of his membership

332

in and activity on behalf of the Union. An examination of the record convinces us that there is adequate evidence to support such a conclusion.

■ As to Farrell, the record shows that he was employed as a legger on the night shift from March, 1936, until February 3, 1938. His activities on behalf of the Union were known to Weisbecker. He had been cautioned against seeking members for the Union inside the Arcadia plant. When he laid Farrell off, Weisbecker stated that he would be re-employed as soon as a job was available for him. Farrell's machine also was sold. He was never re-employed. He testified that he asked Weisbecker if seniority was not controlling and why one Joseph Skzrat, a legger possessing less seniority than himself should be employed while he, Farrell, was without a position. He testified that Weisbecker said to him in respect of Skzrat's employment, "Oh, there was just a little mistake." It also appears that two helpers were promoted to leggers after Farrell was laid off. We are of the opinion that there is adequate evidence to support the Board's conclusion that Farrell was deprived of his position because of his Union activities.

■ As to Klebes, the record shows that he too joined the Union and assisted in its campaign for members. Klebes was a helper earning $15 a week but later was employed temporarily as a legger at $20 a week. We are of the opinion that in Klebes' case the record plainly shows that his services were dispensed with because he was not an efficient legger and no knitter desired him as a helper. We conclude, therefore that the finding of the Board that Klebes was discharged because of his Union activities is without adequate evidence to support it.

■ As to Beluch it appears that he was employed by the Subins for about three years before he was laid off on January 3, 1938. At this time he was employed as a first helper at a rate of $15 a week. He had been active in attempting to organize the Arcadia plant for the Union and had secured members among the Subin employees. On January 3rd, Weisbecker told the other helper upon Beluch's machine to go home and come back in the afternoon when he would be employed upon another machine. Beluch was told to go home and was not re-employed though he ranked all other helpers in point of seniority. We think that the Board was justified in concluding that Beluch was discharged because of his Union activities. He obtained temporary employment at the rate of $22 a week helping to erect hosiery machines. We will require his reinstatement as ordered by the Board.

■ Certain other matters require brief discussion. The Subins contend that the conduct of the examiner was such as to deny them an adequate hearing upon the charges filed against them and that therefore, if the Board's order is carried out, they will be deprived of property without due process of law. They charge that the examiner led witnesses, was severe in his cross-examination of witnesses appearing for the Subins and allowed the Board great latitude in examination while closely restricting the other parties. The examiner is also accused of intimidation or attempted intimidation of witnesses by calling their attention to the fact that they were testifying under oath. Approximately twenty-five different instances have been cited by counsel for the Subins in which it is alleged that the examiner behaved improperly and without due regard for his judicial office. We have examined not only the circumstances specifically referred to but also the record as a whole. We cannot find that the actions of the examiner militated in any substantial manner against the right of the petitioners to bring forth their side of the case. We conclude that the conduct of the examiner was in nowise prejudicial to the petitioners and on the whole was judicial and not intemperate. We use the phrase "not intemperate" advisedly for upon at least one occasion counsel for the Subins saw fit to impute to the examiner a lack of good faith. The hearings seem to have been attended with some heat, but that heat was communicated to the examiner to a very small degree. We would not be justified in setting aside the order of the Board upon this ground. See National Labor Relations Bd. v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, 177.

Paragraphs 2 (b) and (c) of the order of the Board will be modified in accordance with this opinion. All other provisions of the order will be affirmed and a decree of enforcement will be entered.