## AMERICAN ENKA CORPORATION v. NATIONAL LABOR RELATIONS BOARD.

### No. 4733.

Circuit Court of Appeals, Fourth Circuit.

April 7, 1941.

T. R. Iserman, of New York City (Larkin, Rathbone & Perry and Nicholas Kelley, all of New York City, and W. A. Egerton, of Enka, N.C., on the brief), for petitioner.

Edward F. Prichard, Jr., Sp. Asst. to Atty. Gen. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, Ernest A. Gross, Asst. Gen. Counsel, Lewis M. Gill, and William Strong, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is a petition to review and set aside an order of the National Labor Relations Board directing the petitioner, American Enka Corporation, to cease and desist from dominating or interfering with the administration of the Factory Workers' Committees (associations of petitioner's employees), contributing financial or other support to them, or, in any other manner, interfering with, restraining or coercing its employees in the exercise of rights guaran-

teed by section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, and, affirmatively, to withdraw all recognition from the committees as bargaining agencies and to post appropriate notices that it will comply with the order. The Board has answered asking enforcement of the order. It is not denied that petitioner is engaged in interstate commerce within the meaning of the Act and that the practices complained of, if they exist, are within the Board's jurisdiction.

The first question presented by the petition is whether the Board's finding as to domination of, interference with and support of the Factory Workers' Committees is sustained by substantial evidence. As to this, we think there can be no doubt. The evidence with regard thereto is fairly summarized by the Board as follows:

"The evidence establishes that the respondent initiated and formulated the Committees. Such activities occurred prior to July 5, 1935, the effective date of the Act, and therefore cannot constitute unfair labor practices within the meaning of the Act. They are, however, essential to an appraisal of those activities of the respondent subsequent to July 5, 1935, which are in issue in this proceeding, and will now be considered. * * *

"Following the passage of the Act in 1935, the Committees continued in operation substantially as originated by the respondent and without appreciable change in their relationship to the respondent. The management continued to aid the Committees as prior to passage of the Act. All elections were held in the plant during working hours, the employees voting a few at a time so as not to interfere with the plant operations. They consisted, as before, of primary elections in which the voting employee wrote the name of two nominees on a blank ballot form, and final elections in which the employees used ballots containing the names of the four leading candidates. All employees were eligible to vote; there was no provision for membership. Voting booths, ballot boxes, printed forms for the ballots, voting lists, and posters were furnished by the respondent. Posted on the company bulletin boards were announcements of elections to be held and of the results of the elections, the latter including directions to the representatives how to perform their functions. These notices appeared over the name of Gill (the company's plant manager).

"As was true prior to the passage of the Act, each of the two committees met once a month with Gill and Vanderhooven (the company's secretary) and once with Moritz (the company's vice president), Gill, and Vanderhooven. In advance of meetings, representatives were given an opportunity to consult with the employees in their respective departments as to grievances or requests. They then presented these suggestions and complaints or others of their own to the management. The latter discussed the suggestions with the representatives and thereafter made its decision in each case, usually advancing reasons if it refused to act as desired. These conferences with the management occurred during working hours, as did also the consultations between employees and representatives, and employees who attended when they were off duty were paid for four hours' time at their regular rate. The meetings lasted from 3 to 4 hours; Gill assumed responsibility for checking the attendance and for dismissing the meetings. Meetings of the committee representatives without the presence of the management also took place during working hours, usually in the men's or women's cafeteria, and required the respondent's consent.

"In the spring of 1937 the representatives appointed a Special Workers Survey Committee to appraise the rules and regulations governing the committees and to offer suggestions regarding organization. The recommendations of this survey committee included the establishment of an executive council to represent all workers collectively, and the reorganization of the two committees into three with an increase in the number of representatives to provide more equitable representation. These changes were presented to the management for its approval, and after having been approved were submitted to the committees. All the changes were approved by two committees, with the exception of the provision for the executive council which failed to pass the men's committee. One additional change was made in 1939 by the respondent, when, in order to dispense with personal notice of meetings by supervisory officials, it distributed small pocket calendars with committee meeting days marked in red to all representatives. At about this same time, one of the employees, Roy Whitmire, took over from Gill the function of calling the roll at the meetings. Gill continued to keep the attendance records.

"In all other respects the committees continued to function as they had before passage of the Act and the respondent accorded them the same support and aid, and continued its efforts to promote them. No provision was ever made for membership in the committees or for general meetings of employees to instruct delegates or receive reports."

Petitioner relies upon the uncontradicted testimony of a large number of employees to the effect that they were free from coercion by the company in voting for representatives on the committees and that the committees were free of coercion in presenting grievances to and making requests of and demands upon petitioner's management; upon the fact that in November, 1939, it issued a statement to its employees setting forth their rights under the National Labor Relations Act, 29 U.S. C.A. § 151 et seq., and assuring them that they would not be discriminated against because of union membership; and upon the fact that, in an election held by the compa-ny in that year, a large majority of the employees voted in favor of petitioner's contesting the effort to discontinue the existing method of employee representation. None of these matters, however, can avail respondent. Seldom does the domination and interference with employee representation which the Act prohibits take the form of threats or coercion. More often it is to be found in the guise of friendly cooperation; and the purpose of the Act is to prohibit anything which will enable the employer to exert influence on the representatives of the employees in the collective bargaining which it is the purpose of the Act to promote. When the employer himself assists in setting up the bargaining agency, provides the machinery by which the bargaining representatives are chosen, allows the elections to be conducted on his premises and at his expense and pays the representatives for the time devoted to bargaining, he is manifestly taking too great a part in a matter with which he is supposed to have nothing whatever to do.[1] Collective bar-

---

[1] National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 263, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Pacific Greyhound Lines, Inc., 303 U.S. 272, 273, 58 S.Ct. 577, 82 L.Ed. 838; National Labor Relations Board v. Fansteel Metallurgical Corporation, 306 U.S. 240, 262, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; International Association of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. —; National Labor Relations Board v. Wallace Mfg. Co., 4 Cir., 95 F.2d 818, 820; National Labor Relations Board v. J. Freezer & Son, Inc., 4 Cir., 95 F.2d 840; National Labor Relations Board v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 109 F.2d 128. Board findings that the provisions of § 8(2), 29 U.S.C.A. § 158(2), had been violated were sustained in the following cases in which the domination, interference, or contribution took a form similar to that in the case here considered: Union suggested by the employer or organization aided by it, N. L. R. B. v. Falk Corp., 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396; N. L. R. B. v. Fansteel M. Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Fansteel, etc., Corp. v. N. L. R. B., 7 Cir., 98 F.2d 375, 379; N. L. R. B. v. Stackpole Carbon Co., 3 Cir., 105 F. 2d 167, certiorari denied 308 U.S. 605, 60 S.Ct. 142, 84 L.Ed. 506; N. L. R. B. v. American Potash & C. Corp., 9 Cir., 98 F.2d 488, certiorari denied 306 U.S. 643, 59 S.Ct. 582, 83 L.Ed. 1043; Subin v. N. L. R. B., 3 Cir., 112 F.2d 326, certiorari denied 61 S.Ct. 38, 85 L.Ed. —; N. L. R. B. v. Dow Chem. Co., 6 Cir., 117 F.2d 455, and Wilson & Co. v. N. L. R. B., 8 Cir., 103 F.2d 243. Union permitted to use company bulletin boards, N. L. R. B. v. Fansteel M. Corp., supra; Subin v. N. L. R. B., supra. Printing of ballots, constitutions, by-laws or circulars paid for by the employer, N. L. R. B. v. Fansteel M. Corp., supra; N. L. R. B. v. Stackpole Carbon Co., supra; Wilson & Co. v. N. L. R. B., supra. Union allowed to meet on company property or attend to union affairs during working hours without deduction on account of the working time thus lost, N. L. R. B. v. Fansteel M. Corp., supra; N. L. R. B. v. Falk Corp., supra; N. L. R. B. v. Brown Paper Mill, 5 Cir., 108 F.2d 867, certiorari denied 310 U.S. 651, 60 S.Ct. 1104, 84 L.Ed. 1416; N. L. R. B. v. American Mfg. Co., 2 Cir., 106 F.2d 61; N. L. R. B. v. American Potash & C. Corp., supra; N. L. R. B. v. Wallace Mfg. Co., 4 Cir., 95 F.2d 818; N. L. R. B. v. Dow Chem. Co., supra. In the above cases, as in the recent case of N. L. R. B. v. Link-Belt Co., 61 S.Ct. 358, 361, 85 L.Ed. — (Jan. 6, 1941) "no one fact" was "conclusive" to show domination, interference or contribution. It was the "whole congeries of facts be-

gaining becomes a delusion and a snare if the employer, either directly or indirectly, is allowed to sit on both sides of the bargaining table; and, with the great advantage that he holds as the master of pay and promotions, he will be on both sides of the table if he is allowed to take any part whatever in the choice of bargaining representatives by the employees. It is not without significance that, in this case, an election held by petitioner resulted in an overwhelming vote in favor of committee representation, whereas a vote taken by the Board after the disestablishment of the committees, a few months later, resulted in an overwhelming vote in favor of representation by an outside union.

Nor can petitioner take the position that the committees have been purged as a result of the statement which it sent out in 1939. In the first place, it has not ceased to render assistance and support to them. It has not disestablished them and started anew on a proper basis, as was done in the case of E. I. DuPont De Nemours & Co. v. National Labor Relations Board, 4 Cir., 116 F.2d 388, but has clung to the old organizations and retained the old and objectionable practices. Even if the old practices had been abandoned, it would be within the discretion of the Board to order that the old organizations be disestablished as a means of eradicating the effect of past unfair labor practices. National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219.

The second question is whether the Board's finding of anti-union statements and activities by supervisory employees is sustained. We think that it is. Petitioner's hostility to union organization appears from a letter written by its vice president to its employees in 1934, at a time of attempted union organization, in which he stated that he was "against calling in outsiders to handle our internal and personal affairs" and that he "would refuse to join outside organizations whose salesmen may only be interested in collecting your money and sowing discord and discontent". As this occurred prior to the passage of the National Labor Relations Act, it may not be treated as an unfair labor practice within the meaning of that act. It should be considered as background, however, to

anti-union activities on the part of supervisory employees subsequent to the passage of the act and as bearing upon the reasonableness of the scope of the order which the Board deemed necessary in the premises. There is evidence that after the passage of the act, upon a renewal of union activity in the year 1936, an employee was questioned by supervisory employees about distribution of union literature and was threatened with dismissal; that a petition not to join the union was circulated among the employees by a committee representative and its signing urged by one of the minor supervisory employees of petitioner; that a poster was placed on petitioner's bulletin boards which depicted a pay window and bore the inscription, "If you want to close this window, join the C.I.O."; that the employment manager in employing new men advised them to refrain from all union activity; that various supervisory employees made statements evincing hostility to the union; and that the plant police were instructed by their superintendent to prevent the entry of unions and union organizers into the plant and to keep down unions which succeeded in getting an organizational start. Findings as to all of these matters were made by the Board; and we cannot say that they are not supported by the evidence. It is elementary that the credibility of witnesses testifying to such matters is for the Board and not for us.

On the basis of these findings, we think that the order of the Board was justified. Complaint is made of the broad provisions of paragraph 1(b) of the order, which are the same as contained in the provision of the order condemned in National Labor Relations Board v. Express Publishing Co., 61 S.Ct. 693, 700, 85 L.Ed. —. The findings noted in the preceding paragraph, however, distinguish this case from the Express Publishing Company case. It is not a case, as was that, of "Isolated acts in violation of the right of self-organization". It is rather a case, which the Supreme Court itself distinguished, where the record discloses "persistent attempts by varying methods to interfere with the right of self-organization in circumstances from which the Board or the court found or could have found the threat of continuing and varying efforts to attain the same end in the future."

fore the Board" that was determinative, but in the cases cited the factors above designated were thought important by the reviewing courts.

The petition to set aside the order of the Board will accordingly be denied and the order will be enforced.

Order enforced.