**NATIONAL LABOR RELATIONS BOARD**
**v. WILSON LINE, Inc.**

No. 7703.

Circuit Court of Appeals, Third Circuit.

Sept. 24, 1941.

Frank Donner, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, and Ernest A. Gross, Asst. Gen. Counsel, National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Otto Wolff, Jr., of Philadelphia, Pa. (Lewis, Wolff, Gourlay & Hemphill, of Philadelphia Pa., on the brief), for respondent.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

This case comes before us upon a petition to enforce an order of the National Labor Relations Board. The order directed the respondent, Wilson Line, Inc., a steamship company, to cease and desist from its unfair labor practices and affirmatively to withdraw recognition from and to disestablish the Christiana Marine Associa-

tion (C. M. A.) and the Unlicensed Marine Employees Committee (U. M. E. C.) as bargaining representatives of its employees, to reinstate with back pay 19 employees found to have been discriminatorily discharged, to make whole one employee, already reinstated, for wages lost because of the respondent's discrimination, and to post appropriate notices.

The respondent was engaged in the transportation of freight and passengers in an all year round service on the Delaware River and in the transportation of passengers in a summer excursion business on the Delaware, Hudson and Potomac Rivers and the Chesapeake Bay. It owned and operated seven steamers, the "State of Pennsylvania," "City of Wilmington," "City of Camden," "City of Philadelphia" (renamed the "Liberty Belle"), "State of Delaware," "Dixie" and "City of Washington." The four steamers first named, a freighter, the "Christiana," and a tugboat, the "J. C. Reichert," were used in the freight and passenger business; the three steamers last named in the excursion business.

Although the respondent does not concede that the C. M. A. and U. M. E. C. were company dominated it does not contest the validity of that portion of the order which directs the disestablishment of those organizations because it asserts that it has already complied therewith. The character of those organizations, however, is closely allied to the question of the validity of that portion of the order which directs reinstatement with back pay of men alleged to have been discriminatorily discharged. Since that portion of the order is contested by the respondent we shall have to advert to the history of these organizations in some detail.

*Licensed Personnel:*

The history of the controversy with which we are here concerned may be divided into three periods, somewhat overlapping, which may be briefly described as the union organization period, the union contract period and the nonunion period. Prior to 1937 the National Marine Engineers Beneficial Association (M. E. B. A.), a union of marine engineers, and the National Organization Masters, Mates and Pilots, a union of licensed deck officers, had some (but not many) members among the respondent's engineers and licensed officers. Toward the latter part of 1936 and in the early months of 1937 officials of the re-

spondent learned that both unions were gaining in strength among its licensed employees. The respondent's president instructed Campbell, its vice-president and general manager, to take measures to meet this situation. In February, 1937, Campbell called a meeting of the respondent's captains. Eight were present at the meeting.[1] Campbell told them that the respondent wished to enter into an agreement with its employees and gave them a proposed wage rate which he had compiled to be incorporated in the agreement. Except for a suggestion as to hours made by Captain J. A. Phillips there was no discussion of wages, hours or conditions of work. It was assumed that the captains were to procure the the consent of their men to this agreement. Three of the captains present, Emering, Savin and Hunton, were named by Campbell to a committee designated the Marine Employees' Committee (M. E. C.).

About the month of March, 1937, a document authorizing the M. E. C. to represent the signers, together with an agreement prepared by Campbell, was circulated among the employees. The three captains on the committee, together with Campbell, Chillas, the respondent's general agent, and Hardenstine, the respondent's traffic manager, thereafter made a concerted drive among M. E. B. A. and M. M. P. members to obtain authorizations for the M. E. C. to act on their behalf. On March 3, 1937, the M. E. B. A. and the M. M. P. informed the respondent that they represented the majority of its engineers and licensed deck officers and requested a bargaining conference, which request was acknowledged but not acted upon by the respondent. In the meantime, Captain J. A. Phillips, one of the captains present at the February meeting called by Campbell, circulated a letter among the licensed officers urging them to join the M. M. P. On March 1, 1937, Campbell notified Phillips and his two assistant officers, E. E. Graham and W. B. Jackson, all members of M. M. P., that they were furloughed.

On April 21, 1937, the unions filed a charge with the Board alleging that the respondent had discriminated against Phillips and his assistants, had refused to bargain with the unions, and dominated an organization of its employees. In May, 1937, the unions threatened to direct a cease work order. Following this threat

at a conference held on May 8, 1937, the respondent agreed to the reinstatement of Phillips, Graham and Jackson and to the holding of elections to determine the employees' choice of bargaining representatives. The deck officers voted 11 to 9 for the M. M. P. and the engineers 11 for and 11 against the M. E. B. A. On June 11, 1937, the respondent entered into a collective bargaining contract with both unions to expire March 31, 1938. This terminated the first or union organization period of the controversy.

The second period from June, 1937, to February, 1938, marked most drastic measures on the part of the respondent to break the confidence of its employees in the value of self-organization. Discharges of union men took place in rapid succession. Captain F. L. Turner was discharged June 30, 1937, Mate Raymond Miller and Pilot John B. Foster September 23, 1937, Chief Engineer Victor S. Buckworth, Chief Engineer Charles Fitzpatrick, and Relief Chief Engineer Murray Cross on September 29, 1937, Pilot S. W. Bennett, November 23, 1937, Captain W. B. Jackson, Pilot E. E. Graham, and Captain I. W. Haywood on December 4, 1937, Captain J. A. Phillips on December 7, 1937, and Chief Engineer Venus M. Buckworth on December 21, 1937. Each was a union man, each had refused the respondent's solicitation on behalf of the M. E. C., each had voted for M. E. B. A. or M. M. P. at the May elections. At the close of the year 1937 no M. E. B. A. members and only two M. M. P. members were left in the respondent's employ. On February 28, 1938, the respondent notified the unions that it intended to terminate their contract.

The third or non-union period may be said to have commenced March 11, 1938, when those employees who had formed the M. E. C. augmented by some new employees met to consider a new agreement and elect new officers. Captain Emering had been instructed by the respondent to retain an attorney and was authorized to do so by those present at the March meeting. On April 21, 1938, the attorney whom Emering had retained, apparently at his own expense, notified the respondent that the licensed employees had designated a representative committee to negotiate a contract as to hours and wages. The respondent executed a contract on May 3, 1938, which

---

[1] Captains John Emering, J. A. Phillips, Wm. T. Hunton, E. N. Savin, Carl M. Phillips, F. L. Turner, I. W. Haywood and C. J. Turner.

was signed by the members of the committee elected at the March 11th meeting and was later ratified by all but two of the employees. This contract was identical with the former M. E. C. contract except that the wage scale was that procured by the unions. On October 20, 1938, the name "The Christiana Marine Association" (C. M. A.) was adopted. The organization, leadership and policies of the C. M. A. were practically identical with that of the former M. E. C.

The Board found that the respondent discouraged membership in the M. E. B. A. by discharging and thereafter refusing to reinstate four engineer employees, Murray Cross, Victor S. Buckworth, C. A. Fitzpatrick and Venus M. Buckworth, because they joined and assisted the M. E. B. A.; and that it discouraged membership in the M. M. P. by discharging and thereafter refusing to reinstate eight licensed deck officers F. L. Turner, J. A. Phillips, E. E. Graham, I. W. Haywood, W. B. Jackson, S. W. Bennett, John B. Foster and Raymond Miller, because they joined and assisted the M. M. P. We think that the evidence sustains the Board's findings, except as to Captain F. L. Turner whose case will be discussed later herein.

During the summer of 1937 the respondent had in its employ 49 licensed employees, of whom 27 had joined the M. E. C. Of these M. E. C. members 17 were given work throughout the winter and the remaining 10 were recalled in the spring of 1938, whereas of the 22 men who did not join the M. E. C. only 2 were retained in the winter and 3 others offered reemployment in the spring. It appears to us to be more than a coincidence that when the respondent's business required an increase in employees the respondent offered 100% reinstatement to M. E. C. men as against about 22% to men who either did not belong to M. E. C. or did belong to the union. The evidence of the parental solicitude shown by the respondent towards the M. E. C. and its successor the C. M. A., of the marked hostility shown by the respondent towards the unions, of the all inclusive discharge of the union men and the almost exclusive rehiring of company organization men in preference to union men, and of the hiring of new men without an offer of reinstatement to those of its former employees who belonged to the union, was more than sufficient to sustain the Board's finding that both the discharges and the failure to reinstate were because of the union affiliations of those men and were discriminatory. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. As was said in National Labor Relations Board v. Bachelder, 7 Cir., 120 F.2d 574, 578, "* * * the disproportionate treatment of union and non-union workers may under certain circumstances be very persuasive evidence of discrimination." The finding that in each instance the discharged man had seniority within the class of his employment over men not discharged or, if discharged, subsequently reemployed was but one factor considered by the Board on the issue of the character of the discharge and refusal to reinstate. Subin v. National Labor Relations Board, 3 Cir., 112 F.2d 326, certiorari denied, 311 U.S. 673, 61 S. Ct. 38, 85 L.Ed. ——.

Since the discharge of these men and the failure to reinstate them were discriminatory the Board was clearly within its power in directing reinstatement, with back pay, if found by it to be necessary to effectuate the purposes of the Act.

The case of Captain F. L. Turner requires separate discussion. Captain Turner was master of the "Christiana" and was laid off on June 30, 1937, when the freighter was taken out of service. Shortly thereafter the respondent offered Turner the job of pilot on the "City of Camden" which he refused because it meant a demotion in rank and less pay. He asked for the position of relief captain on the "City of Camden" and Campbell's reply was that the company did not see where Turner would fit in on that job. We find no basis for the Board's conclusion that Turner was justified in refusing reinstatement to any position but that of master, either as captain or relief captain. The offer of a subordinate position was not unusual. In its brief the Board states: "The continuity of employment of an engineer or deck officer was not affected by the status of the particular boat on which he was employed; the employees were transferred from boat to boat, and since most of the deck officers and engineers were qualified to serve in various ranks in their respective categories of work * * * they were also shifted in position." This was an established policy of the respondent, not specially devised as a means to discriminate against union men. The record discloses that

the respondent assigned Captains Savin and Lore, who were members of the M. E. C. and C. M. A. to the positions of pilot and mate respectively, even though both, like Turner, were licensed masters. In fact Lore, who was senior to both Savin and Hunton, was assigned to a position inferior in rank to both those men.

The respondent by this practice reserved to itself the right to determine the man best fitted for the post. The record discloses that except for a few months on the "Brandywine" (later converted into a passenger steamer and renamed the "Dixie"), Captain Turner's experience as master was with freighters. The "City of Camden" carried passengers. A due regard for the safety of a vessel makes the selection of experienced and properly qualified officers imperative. Indeed the seaworthiness of the vessel depends in part at least upon their competency. The Lady Pike, 21 Wall. 1, 88 U.S. 1, 22 L.Ed. 499. In Texas Co. v. National Labor Relations Board, 120 F.2d 186, the Circuit Court of Appeals for the Ninth Circuit held that the safety of the ship is paramount to rights guaranteed by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. and that the Board erred in failing to take into consideration the maritime safety laws. We conclude that the Board committed error here with respect to the case of Captain F. L. Turner in not concluding that the respondent offered him appropriate reinstatement, that he refused reinstatement and that he thereupon voluntarily ceased to be an employee of the respondent and is not now entitled to reinstatement or back pay.

### Unlicensed personnel:

■ When in June, 1937, the respondent signed contracts with the M. E. B. A. and the M. M. P. it also entered into a contract with the Harbor Boatmen's Union (H. B. U.) as the bargaining representative of the unlicensed personnel. When in March, 1938, the C. M. A. was brought into existence by Captain Emering and other M. E. C. men acting on behalf of the respondent, to serve as a weapon against outside unionization of the licensed personnel, the Unlicensed Marine Employees' Committee (U. M. E. C.) was brought into existence by the same persons for the same purpose. When the union contracts had been terminated and the respondent signed a new contract in May, 1938, with the C. M. A. it also signed a

contract with the U. M. E. C. On December 4, 1937 when the "City of Camden" was laid up it carried a crew of 18 unlicensed men, of whom 17 were members of the H. B. U. All but one of this crew were discharged. On December 8, 1937, the steamer was put into operation with a crew of 14 men. Only 7 of these men were members of the H. B. U., thus changing the preponderant union character of the crew to one having no definite character. The effectiveness of the change in breaking the strength of the union on that steamer was shown later when even those 7 men who were members of the union joined the company dominated U. M. E. C.

In the opinion of the Board the wholesale discharge of union men was intended to break the union strength of the "City of Camden" crew and did in fact accomplish that purpose. We think that there was sufficient evidence to justify the Board's finding that the discharge of C. W. Hammond, C. E. Coulbourn, Herbert Sapp, LeRoy Cole, A. G. Singleton, W. A. Rittenhouse, M. C. Hoil and H. E. Harris were discriminatory and to justify the Board's order as to reinstatement and back pay for the eight men named.

### The Back Pay Order:

■ We accordingly come to the question raised by the respondent as to the scope of the Board's order directing reinstatement of the discharged men with back pay. The order directs the respondent to pay to these men "a sum of money equal to that which they normally would have earned as wages, including the reasonable value of their maintenance on shipboard, during the period from the date of their discharge to the date of the respondent's offer of reinstatement, less their net earnings during that period, and further, less any amount paid to them by respondent as a result of arbitration proceedings." The respondent contends that this direction is too broad in that it requires the respondent to give the men back pay for the entire period between their discharge and reinstatement, whereas there was no work for them to do during a large part of that period. We do not so construe the Board's order.

Prior to 1937 the respondent operated seven steamers, a freighter, a tugboat and a repair yard. Its customary practice at the close of each summer season was to lay up the three steamers used in the ex-

cursion business but to continue operating the remaining four passenger steamers, the freighter, the tugboat and the yard. In September, 1937, the respondent, following its usual practice, laid up its three excursion steamers for the winter. In that year the respondent discontinued its freight business. On June 30, 1937, it laid up the freighter "Christiana" and the tugboat "J. C. Reichert." On December 3, 1937, it laid up all its remaining steamers except the "City of Camden" which it operated in a ferry service from December 8, 1937, to April 29, 1938. Then that steamer also was laid up. As a result of these curtailments after April, 1938, it operated steamers only four months out of each year.

It thus appears that respondent's operations during the period with which we are concerned have not only been seasonal in character, but have been definitely curtailed during all seasons of the year. In the light of the seasonal character of the respondent's business it is clear, as was pointed out by the Circuit Court of Appeals for the Fourth Circuit in National Labor Relations Board v. Planters Mfg. Co., 4 Cir., 106 F.2d 524, that the Board's order of reinstatement does not mean that employees "must be furnished employment at a period when due to the seasonal nature of the respondent's business no employment is available, but merely that they be restored to their former position and given work when other like employees are given work. Likewise, the order with respect to back pay does not mean that the employees are to be paid wages for the entire period that has elapsed since their discharge, but merely that they shall be paid what they would have earned during that period if they had not been discharged, taking into account the seasonal character of the employer's business." Likewise, since the respondent is under no obligation to employ more men than its curtailed activities require (Union Drawn Steel Co. v. National Labor Relations Board, 3 Cir., 109 F.2d 587), the Board's order may not be construed to mean that the respondent must reinstate men for whom under its curtailed program no work is available except through the displacement of employees having greater rights. Nor may it be required to give back pay to discharged employees for periods during which there would have been no work for them because of the curtailment. We think that a contrary construction of the Board's order would render it invalid as imposing a

penalty upon the respondent. See Republic Steel Corp. v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6.

The question which we are considering, therefore, narrows down to whether the men who were discriminatorily discharged by reason of their union activities were entitled to the jobs which were available on the "City of Camden" between December, 1937, and April, 1938, to the jobs available on the excursion steamers operated each year between May and September, and at other times to such jobs as were available in the respondent's yard. The Board found that in the past the respondent's practice in making work assignments had been to give preference on the basis of seniority and that in each instance the discharged man had seniority over some of the men retained in the respondent's employ. Although the Board did not define its use of the word "seniority" it is obvious from its opinion that the Board was referring to the length of service within the particular class of employment. Thus the length of service of a master, mate, pilot or engineer was judged solely in relation to the length of service as such of other masters, mates, pilots or engineers in the respondent's employ. This is undoubtedly a fair use of the term when the right to a job within the particular class is at issue. We think, however, that such a test of seniority is valid only if the work denied the employee alleged to have been discriminatorily discharged is within the scope of his particular class, but that if it is of a kind not restricted to his class another test of seniority must be applied. For example, if a captain's position is available seniority within the class of masters is the pertinent test, but if the only kind of employment available is general work in respondent's yard—work of a kind which should be open to any and all of the respondent's employees—then seniority should be determined on the basis of the time of the worker's entry into the respondent's employ. For the sake of brevity of designation we shall call the first type "class seniority," and the second "service seniority."

The case of Captain J. A. Phillips, one of the discharged licensed deck officers, illustrates the application of the two types of seniority just described. An examination of the Board's Exhibit 44-A discloses that of the twelve masters in the respondent's employ Captain J. A. Phillips had

seniority within the class of master as to all save Captain John Emering. Therefore, when in December, 1937, there was but one position as captain available, that on the "City of Camden," an application of the "class seniority" rule resulted in giving proper preference to Captain Emering. However, there were other positions available on the "City of Camden" for licensed deck officers, namely, those of relief captain and of pilot. Captain Phillips had seniority within the class over Captain Wm. T. Hunton, to whom the position of relief captain was given, for Phillips entered the respondent's service as relief captain May 1, 1917, whereas Hunton did not do so until June, 1923. Then again Phillips entered the respondent's service as pilot in 1917, and Captain E. N. Savin, to whom that position was given, did so August 23, 1918. It is obvious that Captain Phillips was entitled to a licensed deck officer's position on the "City of Camden," on the basis of "class seniority."

In addition each year when the respondent operated the summer excursion steamers Captain Phillips was entitled to a position as master of one of the steamers in preference to all but Captain Emering and as a licensed deck officer on one of the steamers in preference to all others. When the summer excursion period was over there was work available in the respondent's yard. In applying the "service seniority" rule to which we have referred we find that Phillips entered the respondent's employ on March 4, 1911, and according to the lists attached to the respondent's brief was number 6 on the "service seniority" list. Therefore, provided the respondent employed six men in its yard, Phillips was entitled to be one of the six. The respondent's work records, up to and including May 3, 1938, are in evidence. The application of the "class seniority" and "service seniority" rules, which we have just discussed, will impose no hardship upon the respondent. By reference to its own work records from May 3, 1938, to the date when the respondent makes a bona fide offer of reinstatement to Captain Phillips and by the application of the "class seniority" and "service seniority" principles thereto it will be able to determine the amount of back pay due Captain Phillips.

 The respondent urges that the order for back pay is invalid. It points out that the last work records in evidence are dated May 3, 1938, and argues therefrom

that no order for back pay after that date can be valid because it cannot be based on the evidence. This contention cannot be sustained. As we have already pointed out, there is evidence that the discharges and failure to reinstate were discriminatory and that retention of employees on the basis of seniority was in effect in the respondent's business. We have pointed out when "class seniority" and when "service seniority" are applicable. The determination of the date of reinstatement of the employees ordered reinstated is within the respondent's own control. Nothing remains to be done, therefore, except for the respondent to determine its liability for back pay in each instance by reference to its own work records. As we said in National Labor Relations Board v. Fashion Piece Dye Works, Inc., 100 F.2d 304, 305: "The amounts in fact due each of the discharged employees can best be determined by the parties involved, who can calculate the same by applying the standard set out in the Board's order." In the present case the standard to be applied is as we have hereinbefore indicated.

 The respondent argues that the Board has not exercised due diligence in prosecuting the complaint and that the respondent should not be penalized by being compelled to reimburse the discharged employees for back pay accrued during the period in which the Board needlessly delayed. The docket entries show that the complaint was issued October 14, 1938, one year after the discharge of the men; that the Board did not enter its decision and order until May 27, 1940, one year after the exceptions were filed to the trial examiner's intermediate report, and did not petition this court for an enforcement order until March 29, 1941, 10 months later. The respondent's contention cannot be sustained. The National Labor Relations Act, 29 U.S.C.A. § 151 et seq., sets no time limitation within which charges of unfair labor practices must be lodged. National Labor Relations Board v. Crowe Coal Co., 8 Cir., 104 F.2d 633, 640. Nor does the act direct when the Board must render its decision. The same flexibility is allowed to this administrative agency as to courts of record, and the same factors of crowded dockets and inadequate personnel may result in the unfortunate delays of which litigants often justly complain.

In the present case we see no equity in imposing the burden of the delay upon the men whom the respondent discriminatorily

deprived of their jobs. Moreover the act has not conferred jurisdiction upon this court to determine whether the Board has acted with adequate promptness in disposing of the business before it. We may add that the act confers upon the party who deems himself aggrieved by the Board's order the right to petition this court for a review of that order. The respondent need not have waited until the Board asked for an enforcement order. In National Labor Relations Board v. Aluminum Products Co., 120 F.2d 567, page 573, the issue of laches by the Board in seeking an enforcement order was answered by the Circuit Court of Appeals for the Seventh Circuit by the terse statement: "But we do not understand that orders lose their validity or cease dynamic existence merely because the Board delays in seeking an enforcement order. From the time of its entry, it was binding upon respondents. If they believed it should not be enforced, they had the right to assert such belief in a proper proceeding." We are not persuaded that we have either the power or the justification to modify the Board's order as to back pay on the ground of the Board's delays.

The Board requests that its order be modified by eliminating the provisions relating to work relief payments in accordance with the ruling of the Supreme Court in Republic Steel Corp. v. National Labor Relations Board, supra.

The order of the Board is modified by striking from paragraph 2(c) the directions relating to moneys received by the employees, directed to be reinstated, for work performed upon work relief projects and by striking from Appendix A the name of F. L. Turner. As so modified the order is affirmed. A decree enforcing it will be entered.