NATIONAL LABOR RELATIONS BOARD
v. KOPMAN–WORACEK SHOE
MFG. CO.

No. 13374.

Circuit Court of Appeals, Eighth Circuit.
Dec. 5, 1946.

Rehearing Denied Jan. 2, 1947.

Stephen M. Reynolds, of Minneapolis, Minn. (Gerhard P. Van Arkel, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Owsley Vose and Thomas C. Marshall, all of Washington, D. C., on the brief), for petitioner.

Sylvan Agatstein, of St. Louis, Mo., for respondent.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

104

GARDNER, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order based upon findings that Kopman-Woracek Shoe Manufacturing Company had been guilty of certain unfair labor practices within the meaning of Section 8(3) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3). The complaint alleges that respondent had discriminatorily discharged certain named employees; that it had failed and refused to reinstate the employees discriminatorily discharged; that the discharges and refusal to reinstate were for the reason that the named employees had joined and assisted the union and engaged in union activities with other employees for the purpose of collective bargaining and other mutual aid and protection; that it questioned employees concerning their union affiliations and activities; that it urged, warned, threatened and persuaded its employees against engaging in union activities and against joining the union or any other labor organization; that it aided and encouraged a demonstration against the union representative; that it granted a wage increase for the purpose of discouraging membership in the union. It is also alleged that by these acts respondent interfered with, restrained and coerced its employees in the exercise of their rights guaranteed in Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157, and engaged in unfair labor practices within the meaning of Section 8, subsection (1) of the Act.

Respondent filed an answer, putting in issue all the allegations charging it with unfair labor practices. On hearing before a trial examiner findings adverse to respondent were made on all issues except as to certain of the discharges alleged to have been discriminatory and a charge that respondent had aided and encouraged a demonstration against the union representative. The Board sustained the findings of the examiner with certain exceptions not here material and entered its cease and desist order which is in conventional form.

Respondent is a Missouri corporation, having its principal place of business at Flat River, Missouri, where it is engaged in the manufacture, sale and distribution of women's and girls' shoes. During all times here material it employed approximately 300 employees, many of whom were married women with families. Prior to 1944 there had been no organized union of its employees and no union activities at respondent's plant. About March 15, 1944, a representative of the Boot and Shoe Workers Union, at the request of certain of respondent's employees, inaugurated an organization campaign among the employees, and certain meetings were held by interested employees at the hotel, while handbills and authorization cards were distributed at the plant. It was during and immediately following this unsuccessful campaign that the unfair labor practices are alleged to have occurred.

■ Counsel for respondent has gone far afield both in his brief and in his oral argument in an attempt to demonstrate that the National Labor Relations Act has failed of its purpose and is in fact a vicious law. In support of this contention he has quoted copiously from articles in periodicals and metropolitan newspapers. With the wisdom or efficacy of this law we can not concern ourselves. It is prescribed by statute and the question as to whether its enforcement works an injury or prevents a proper administration of justice is a matter for consideration of the Congress and not of the courts.

■ One of the acts found by the Board to constitute an unfair labor practice was the sending of a circular letter on March 24, 1944, addressed to the employees of respondent and signed by the respondent. This letter was enclosed in the pay envelope of each employee. Respondent urges that it was not coercive in character and was within the guaranty of the First Amendment. The employer has the undoubted right to express his opinion on the merit of labor organization controversies and the right to indicate his preference for individual dealings with the employees. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; N. L. R. B. v. American Pearl Button Co., 8 Cir., 149 F.2d 311; N. L. R. B. v. J. L. Brandeis & Sons, 8 Cir., 145 F.2d 556; N. L. R. B. v. Mont-

gomery Ward & Co., 8 Cir., 157 F.2d 486. The Supreme Court has made it very clear that the employer's constitutional guaranty is entitled to the same protection as that of the employee. While the employer may attempt to persuade his employees with respect to joining or not joining a union, he may not, however, indulge this right to the extent of coercion or threats of reprisal. In view of our conclusion on other phases of respondent's acts, we think it unnecessary to extend this opinion by setting out the contents of this letter, but we assume without deciding that respondent is correct in its contention that the letter, standing by itself, is within the guaranty of the First Amendment.

█ It is clear from the testimony that the Board was warranted in finding that certain of respondent's supervisory officers were hostile to the union, and we think these officers were clothed with such authority as to make respondent responsible for their acts and conduct. Among these acts we refer to those which seem clearly to be violative of the rights of employees guaranteed them by the National Labor Relations Act. Thus, foreman Gallagher who had sponsored the circulation among employees during working hours of an anti-union petition for signature by the employees and had questioned many employees concerning their union affiliations and activities and had indicated a hostility toward the union, said to employee Grace Wisdom: "You will find if unions get in it will be worse than it is. I feel it is my place to tell you before you get in too deep." To another employee he showed an article kept by him under the glass top of his desk, which discussed the plight of the employees of a shoe factory at Chaffee, Missouri, who had lost their jobs when the factory closed down because of a union attempt to organize the employees.

Forelady Saporiti admonished one of the employees working under her that respondent "could not pay any more, they were paying as much as they could already and would have to close the doors." On another occasion she warned a group of employees working under her that: "If the union gets in maybe you will not have to work at all. You all will have to sit on your chair and look pleasant. * * * Look at the girls at Chaffee, Missouri. They do not have to work any more." To another employee she said, "If the union gets in here we will all be walking the streets."

█ These were not mere expressions of personal opinion, but were threats and appeals to the employees' fear that they would lose their jobs if they should organize the union. These threats that the plant would be shut down and that the employees would be walking the streets were clearly violative of the Act. N. L. R. B. v. American Pearl Button Co., supra; N. L. R. B. v. Crown Can Co., 8 Cir., 138 F.2d 263. These statements made by the company's supervisory representatives, considered in view of all the facts and circumstances disclosed by the evidence, tended, we think, to interfere, restrain and coerce the employees.

We pretermit as unnecessary a consideration of the other acts found by the Board to be violative of the National Labor Relations Act, except the findings as to discriminatory discharges, because the foregoing conduct on behalf of respondent's supervisory employees was such as to warrant the Board's finding of unfair labor practices. It remains to consider the action and finding of the Board with reference to the discharges of certain employees.

On March 30, 1944, respondent is alleged to have discharged Hayden Sebastian. He was employed February 10, 1944, but testified that he had been twice employed by respondent at some prior times, the date of which he did not definitely fix. He was active in the union's organization campaign and signed up some thirty of the employees in his department. Foreman Reily was his immediate superior. On March 30, 1944, he and Reily became involved in an argument growing out of an unfavorable comment by Reily concerning the manner in which Sebastian was heeling shoes. It is the contention of respondent that Sebastian was not discharged but left respondent's employment of his own volition. He and Reily seem to have indulged in frequent arguments before there were any

union activities in the plant. Sebastian in his testimony says, "We had those arguments before the union got there, and had them after the union came down." He further testified as follows:

"Q. About how often did you have arguments before the union came in? A. I imagine twice or three times a week.

"Q. Did he ever threaten to lay you off or discharge you? A. No, he never did.

"Q. That question never came out in all those arguments? A. He told me he would fire me some day if I did not quit arguing with him, and I said I didn't care.

\* \* \* \* \* \*

"Q. You really do not know whether you were discharged or quit? A. Well, the way he explained it to me, he was firing me, for my own benefit, that I could get my check and would not have to wait until pay day to get it.

"Q. If you had left voluntarily you would have to wait until the end of the week for your pay? A. That is right.

"Q. But if in the position of being discharged— A. Anyone discharged received their check right then and there.

"Q. And that is what you did? A. That is right.

\* \* \* \* \* \*

"Q. Did you intend to quit, and accepted the discharge so that you could get your money sooner? A. Yes.

\* \* \* \* \* \*

"Q. If you had quit you would have had trouble getting a certificate of availability for another job? A. That is right.

"Q. Whereas if you were discharged you could go down and be available for a job at any time? A. Yes, sir.

"Q. And you knew that and he knew that too? A. Yes."

Mr. Woracek, a witness for respondent, in referring to his interview with Sebastian at the time he left respondent's employment, testified:

"The next step was to get his release. He had to come to me for it, for no one in the plant is authorized to issue releases except Mr. Kopman or myself. He came to me and asked me to discharge him. I said, 'What is the matter, Hayden?' He

said, 'I want to leave you.' I said 'OKay, we will accommodate you.' That is the reason for the notation of discharge on his payroll record."

This testimony was not denied by Sebastian. Sebastian had on a prior occasion quit the employ of respondent. Accepting Sebastian's own testimony, we do not think it warrants a finding that he was discharged for any cause. There is certainly nothing in his testimony to indicate that his relations with the company were severed by reason of any union activities on his part.

Esther Helm was employed by respondent about July 1, 1943. She was active in the union campaign, attended the union meetings, signed a union card and refused to sign the anti-union petition. Her work had brought commendations from her foreman Gallagher. She worked on Thursday, April 27, 1944, but did not return the next day because her children were ill. The plant did not work on Saturday but on the following Monday she reported at the plant for work but found that her work card had been "pulled." Gallagher told her that her money was waiting for her in the office, and at the hearing he testified that he discharged Mrs. Helm because she did not report her absence. There was no rule or regulation requiring employees to report absences and she had been absent on numerous prior occasions and had not reported them and nothing was ever said to her about it. A few days prior to her discharge Gallagher had accused her of being a union booster and suggested that she was too good a worker to join a union and that she could get a raise in pay without joining a union. On the occasion of her discharge she was absent only one day. We think the evidence warranted the finding that her discharge was discriminatory.

Lena Young was last employed by respondent in February, 1944. She had worked in respondent's plant in September, 1943. She was active in the union campaign, attended union meetings, signed an authorization card, solicited other employees to sign union cards, and she had declined to sign the anti-union petition.

During the union campaign her foreman, Fenton, asked her if she had attended the union meetings. The last day she worked at the plant was Thursday, April 27, 1944. She was not feeling well and after working hours told the foreman that if she did not feel better the next day she would not come to work, to which Fenton replied that it was all right. She was ill the next day, which was Friday, and did not return to work and the plant did not work on Saturdays, but she reported for work on the following Monday and found that her card had been "pulled." Her foreman told her that when she learned to stay on the job she could have her card back and told her that her check would be ready in a few minutes. There were no complaints with reference to the character of her work and there had never been any complaint about her absences. The finding of the board that the discharge of Lena Young was because of her union activities is sustained by substantial evidence.

The evidence concerning the discharges of Verna Tucker, Henrietta Huey, Lydia Wood, Hazel Miller and Nettie Roegner, all of which occurred October 26, 27, and 28, 1944, is so similar to that with reference to the discharge of Esther Helm and Lena Young as to make it unnecessary to set it out in detail. We think the finding that these employees were discriminatorily discharged is sustained by substantial evidence.

Lottie Glore was not discharged until June 29, 1944, and her discharge was not predicated upon absenteeism nor upon failure to report her absences. She was hired by respondent in October, 1943, and assigned to forelady Saporiti's department. She was working on a cementing machine except when there was no cement work to be done, and there is no testimony indicating that her work was not satisfactory. She signed a union authorization card, attended meetings of employees seeking to organize the union and solicited her fellow employees to join the union. She had been questioned by her foreman about the union and warned that if the union got into the plant the employees would be "walking the streets." On June 27, 1944, her forelady, Saporiti, assigned Violet La Rose, another employee, to do some cementing work and transferred Glore to the taping work which La Rose had been doing. The taping work ran out before the day was over and Glore was sent home. The next day Glore worked at her cementing machine all day, but on June 29th, when she went to work at the cementing machine, she was stopped by Saporiti and told to go on the taping machine, and La Rose was assigned to the cementing machine. Glore protested, saying that she would go to the taping as soon as she ran out of cementing work. She testified as follows:

"I told Violet (La Rose) to go back at her work, she could not have my machine. She went back and told Julia (Saporiti), and Julia came down and talked to me and told me to go over and tape, and let Violet have my machine. I told her 'No, Julia, you did this on Tuesday and I went home.' I said, 'That is not going on any more. I will not give her my machine. When I run out of work I will gladly go over and tape, but until I do run out of work, I will not give her my machine. Let her tape.'"

Saporiti then left Glore and sent her assistant, Nellie Smith, to talk to her, but she told Smith that she would not go to taping. Saporiti then returned to Glore's machine and grabbed up the work and threw it on another machine and said to Glore, "You say you will go and tape when you get through cementing. * * * You will go then, for you are out of work." Glore replied, "I still won't go * * *." Saporiti then said, "I will get your card then." To this Glore replied, "You might as well get it if that is the way you are going to shove me around, for I will not do it." Saporiti went to the manager's office and received her discharge. There was no difference in the compensation as to the two classes of work, but taping was cleaner work than cementing. Glore did cementing and taping while working but on the occasion of her discharge she refused to do taping work although directed so to do. The Board did not find that the transfer of Glore from cementing to taping work was discriminatory, but the Board found that her discharge was discriminatory. In N. L.

07

R. B. v. Montgomery Ward & Co., supra [157 F.2d 496], we said:

"Any employee may, of course, be lawfully discharged for disobedience of the employer's directions, in breach of his contract. N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; N. L. R. B. v. Columbia Products Co., 2 Cir., 141 F.2d 687. While these employees had the undoubted right to go on a strike and quit their employment, they could not continue to work and remain at their positions, accept the wages paid to them, and at the same time select what part of their allotted tasks they cared to perform of their own volition, or refuse openly or secretly, to the employer's damage, to do other work. C. G. Conn, Ltd. v. N. L. R. B., 7 Cir., 108 F.2d 390; N. L. R. B. v. Condenser Corp., 3 Cir., 128 F.2d 67; N. L. R. B. v. Mt. Clemens Pottery Co., 6 Cir., 147 F.2d 262."

The employer has the undoubted right to direct the employee as to the task to be performed and the manner of its performance. Glore flatly refused to comply with the directions of the employer and it is manifest that this was such insubordination as to warrant, if indeed not require, her discharge. It was not up to her to determine what she should do. If the work assigned to her was not to her liking, she might, of course, have quit the job, or might have complained to the manager if she felt aggrieved as to the transfer, or, indeed, the transfer might have been the basis for a charge of discrimination. This, however, was not done, and there being valid ground for discharge, the suggestion that the discharge was not for her disobedience of the employer's direction, but was because of her union activities, is purely speculative and conjectural. She was certainly discharged at the time of and in connection with her defiant disobedience of the employer's direction, and there is no substantial evidence sustaining the finding that her discharge was for her union affiliations or activities.

Bettye Walsh was employed by respondent on December 30, 1943. She was discharged July 25, 1944. She had signed a union card and refused to sign the anti-union petition, but did not attend any of the union meetings. The last day she worked at the plant was July 11, 1944, at which time she told a fellow-employee who worked with her that she had had a toothache for two days and that if it continued she would not report for work next day and that if she did not to inform foreman Gallagher. This her fellow-employee agreed to do and she did not work on July 12, but on July 13 she started to work but because of illness she had to quit and sent a note to her foreman explaining her absence. On the 14th she was still ill and sent a note to the office to that effect. On July 22nd, she received a postal notice asking her to advise her foreman immediately when he might expect her to return to work. The 22nd was Saturday, and the following Monday she sent word to her foreman that she would return to work on Tuesday, the 25th, if she were able. Reporting to work on Tuesday, the 25th, she found that her card had been "pulled," and was told by her foreman that he had put someone else in her place. Prior to her union activities she had been absent from work without reporting and nothing had been said about it. We think the evidence warranted the finding that her discharge was discriminatory.

The cease and desist order will be modified in accordance with the views expressed in this opinion, and as so modified will be enforced.