## NATIONAL LABOR RELATIONS BOARD v. WINONA TEXTILE MILLS, Inc.

### No. 13450.

Circuit Court of Appeals, Eighth Circuit.

March 4, 1947.

Rehearing Denied April 21, 1947.

Stanley D. Kane, Atty., National Labor Relations Board, of Minneapolis, Minn., (Gerhard P. Van Arkel, Gen. Counsel, Morris P. Glushien, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Dominick L. Manoli and Julius G. Serot, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

H. M. Lamberton, Jr., of Winona, Minn., for respondent.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

This petition by the National Labor Relations Board is for enforcement of the Board's order entered against respondent Winona Textile Mills, Inc., in proceedings under Section 10 of the National Labor Relations Act, 29 U.S.C.A. § 160. The Trial Examiner found that respondent had engaged in unfair labor practices at its mill in violation of Sec. 8 (1, 3, 5) of the Act, 29 U.S.C.A. § 158 (1, 3, 5).[1] Specifi-

---

[1] 29 U.S.C.A. § 158. Unfair labor practices by employer defined. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

\* \* \* \* \* \* \*

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: \* \* \*

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title. July 5, 1935, c. 372, § 8, 49 Stat. 452."

cally, he found that respondent interfered with, restrained and coerced its employees in the exercise of the rights guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157,[2] in violation of Section 8(1), that respondent discriminatorily discontinued overtime work for eleven of its employees in violation of Section 8(3), and that respondent refused to bargain collectively with the International Ladies' Garment Workers' Union, American Federation of Labor, the exclusive representative of respondent's production and maintenance employees, in violation of Section 8(5). The Board adopted the intermediate report of the Trial Examiner, overruled exceptions thereto, and entered the order which it seeks to enforce. The order requires respondent to cease and desist from its unfair labor practices, to make whole the employees discriminatorily denied overtime, to bargain collectively with the union, on request, and to post appropriate notices. The decision and order of the Board, including the fact findings, are reported in 68 N.L.R.B. 702.

█ The interstate character of respondent's activities is admitted and the propriety of the Board's order is challenged only on the ground that the Board's findings are not sustained by substantial evidence. While there is some conflict in the testimony, the principal points of difference arise from the inferences drawn from the evidence and the ultimate conclusions reached. In our consideration of the case we are governed by the rule succinctly stated by the Supreme Court in Medo Photo Supply Corporation v. National Labor Relations Board, 321 U.S. 678, 681, 682, 64 S.Ct. 830, 832, 88 L.Ed. 1007, in these words:

"It has now long been settled that findings of the Board, as with those of other administrative agencies, are conclusive upon reviewing courts when supported by evidence, that the weighing of conflicting evidence is for the Board and not for the courts, that the inferences from the evidence are to be drawn by the Board and not by the courts, save only as questions of law are raised and that upon such questions of law, the experienced judgment of the Board is entitled to great weight. See Franks Bros. Co. v. [National] Labor Board, 321 U.S. 702, 64 S.Ct. 817, [88 L. Ed. 1020], National Labor Board v. Southern Bell Co., 319 U.S. 50, 60, 63 S.Ct. 905, 910, 87 L.Ed. 1250, and cases cited; National Labor Relations Board v. Nevada Copper Co., 316 U.S. 105, 106, 107, 62 S. Ct. 960, 961, 86 L.Ed. 1305, and cases cited; cf. Dobson v. Commissioner, 320 U.S. 489, 501, 64 S.Ct. 239, 246, [88 L.Ed. 248,] and cases cited."

In view of the publication of the report of the findings and decision of the Board it is not necessary to state the case in full in this opinion but only sufficient to make clear the grounds of our decision.

The respondent is a corporation located in Winona, Minnesota, and is engaged in the manufacture, sale and distribution of woolen and marino yarns for the knitting and weaving trade. The mill is a relatively small one, having less than 40 production employees in the Fall of 1945. On August 5, 1945, the International Ladies' Garment Workers' Union, hereinafter referred to as the union, began to organize respondent's mill employees through a paid organizer, Annie Lee Hewett. On the following day, August 6, an employee, Wilton Berger, who had refused to join the union, informed respondent's plant manager, J. E. Temple, who was in complete charge of respondent's operations, of the attempt to organize the union. Berger testified that there was some discussion between him and Temple, and that Temple finally stated profanely that there would be "no * * * union come in," regardless of what anyone said, and that if the union got in the plant he would close it up.

On August 14, 1945, an attorney for the union informed respondent by letter that the union represented a majority of the

[2] 29 U.S.C.A. § 157. "Right of employees as to organization, collective bargaining, etc. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection. July 5, 1935, c. 372, § 7, 49 Stat. 452."

employees, that it desired to enter into collective bargaining negotiations and that respondent should advise the union attorney or organizer Hewett when respondent's representatives would meet with those of the union. The respondent did not answer the letter, and on August 17 respondent posted in the plant an announcement addressed to its employees. The announcement informed the employees of attempts respondent had made to secure wage increases for the employees, explained the difficulties of obtaining increases because of the wartime wage stabilization program then in effect, and informed the employees of respondent's conviction that the plant management and employees would be better off without "outside interference and control." It also informed the employees that it was unnecessary for them to join a union in order to work at the mill, and that the question of joining a union was for each individual employee to decide. In addition, the announcement contained the following paragraphs:

"The Law does not require employees to organize; no more than it requires an employer to operate his plant. * * * It has been our policy to pay overtime to our regular employees, rather than to put on an additional shift, which would have been justified by the amount of our orders, but would also have lowered the weekly earnings of many of our employees. As you know, our policy in regard to overtime has always been generous and favorable to the employee."

On August 24, 1945, respondent received notice from the Division of Conciliation of the State of Minnesota that the union had filed a Petition for Investigation and Certification of Representation for Collective Bargaining and that a hearing would be held on August 29 to determine the issue.

For a long period of time prior to August 1945, respondent had operated its carding and spinning departments on an overtime basis, thus affording additional compensation to the employees. The cardroom served as a feeder for the spinning department and, as respondent had fewer carding machines than spinning mules, the cardroom employees were required to work longer hours than spinning room employees in order not to interrupt production. In the latter part of August respondent entirely discontinued overtime work in the spinning department and reduced overtime work in the carding department. The cardroom employees continued to work that amount of overtime necessary to maintain a 40-hour work week in the spinning department. The overtime work was discontinued notwithstanding the fact that respondent had sufficient orders and sufficient stock on hand 'to supply overtime work for several months. The employees were first informed of the discontinuance of overtime work on August 24, 1945, immediately following receipt of the notice of pendency of the union's petition for certification as the collective bargaining representative of the employees.

On August 29, 1945 the Minnesota Division of Conciliation conducted a hearing which was attended by counsel for respondent and for the union. Subsequently the Division concluded that the unit appropriate for collective bargaining consisted of all of respondent's production and maintenance workmen, exclusive of supervisory and clerical employees. On September 10, 1945, a secret election was conducted. The union was successful by a vote of 18 to 14 and was certified as the collective bargaining representative of the employees in the unit. On the day following the election employee Berger discussed the result with plant manager Temple, and the latter remarked, "The union has got 18 babies to take care of and I got 14. I will take care of my 14, let the union take care of their 18."

A conference to negotiate a collective bargaining contract was held on October 6, 1945. At the conference the union spokesman, Meyer Perlstein, presented the demands of the union. These demands were five in number and included a minor request for sanitary improvements, demands for wage increases and paid vacations and a demand for a closed shop agreement. The issue concerning sanitary conditions was promptly disposed of, but respondent's attorney objected vigorously to a closed

shop agreement and insisted that the closed shop issue be disposed of favorably to respondent before he would discuss the other demands. Perlstein urged respondent's attorney to discuss other issues first and leave the closed shop issue for later discussion. Neither side would yield and the conference ended in an impasse. During the course of the conference, which was attended by five employees as well as representatives of respondent and the union, respondent's attorney stated that respondent would not tolerate labor trouble, that if the employees wanted a union there wasn't anything to keep respondent from moving out and that a town in Ohio had offered to provide space for respondent's plant. The Board rejected respondent's explanation that the remarks were made in a facetious vein and held that there was a threat to move the plant if the employees unionized.

On October 18, 1945, respondent wrote to its employees, stating its version of the October 6 conference, informed the employees of respondent's rejection of the union requests and emphasized the inability of the union to reach agreement with other employers in that locality. On December 3, 1945, respondent's attorney met employee Frances Kiekhoefer at a social gathering. Kiekhoefer testified that the attorney accused her of being a union ring leader and stated, among other things, that Temple could sell the plant equipment, or he could move to another town. Later in December 1945, without notice to the union, which was then the accredited bargaining representative of the employees, respondent posted in its plant the following notice:

### "Wage Announcement

"Believing that the large majority of our employees are not in favor of labor trouble which would inevitably increase cost of production and result in unnecessary loss to everyone concerned and in an effort to cooperate with President Truman and the Federal Government's expressed policy, the management will grant pay raises of 5¢ per hour throughout the mill commencing Dec. 3.

"All new employees will start at 45¢ per hr. for an initial three month training or probation period. If prior to or at the end of this 3-month period, the worker shows satisfactory interest, aptitude and skill in the work, he or she will be raised 5¢ per hr. or will be dropped from the payroll and on or before the expiration of an additional or final 3-month training period, if the worker shows satisfactory progress, he or she will receive an additional 5¢ per hr. or will be dropped from the payroll.

"In the event that the management decides to put on a nite shift nite workers will be paid an additional 5¢ per hr. Should the management decide a Christmas bonus is warranted, such bonus will be based on the employees total earnings for the last half of the year.

"In an effort to promote increased unity and harmony in the mill, the management will appreciate any suggestions or complaints, from the employees. These may be made either personally or in writing, signed or unsigned."

### Coercion and Interference.

Respondent insists that it did not interfere with or coerce its employees in the exercise of their rights to organization and collective bargaining in violation of Section 8(1) of the Act but the facts epitomized above do not sustain this contention. Rather they disclose a series of acts and conduct which the Board could find were intended by respondent to convince the employees that economic disaster would be their reward for joining the union movement, and to interfere with the employees in the exercise of rights guaranteed to them by Section 7 of the National Labor Relations Act. Respondent contends that Temple's "off-hand statements" to employee Berger were not intended for employees generally and had no coercive effect on Berger. That the coercive remarks did not actually intimidate respondent's employees would constitute no defense. Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 134 F.2d 240, 244; National Labor Relations Board v. John Engelhorn & Sons, 3 Cir., 134 F.2d 553,

556. See also National Labor Relations Board v. Link Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Crown Can Co., 8 Cir., 138 F.2d 263. Whether Temple's statements to Berger, standing alone, would justify a finding of coercive action we need not decide, for they cannot be so isolated and must be considered with other statements and conduct which in the aggregate amply sustain the Board's decision. As stated by the Supreme Court in National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 348, 86 L.Ed. 348:

"The employer in this case is as free now as ever to take any side it may choose on this controversial issue. But certainly conduct, though evidenced in part by speech, may amount in connection with other circumstances, to coercion within the meaning of the Act. If the total activities of an employer restrain or coerce his employees in their free choice, then those employees are entitled to the protection of the Act. And in determining whether a course of conduct amounts to restraint or coercion, pressure exerted vocally by the employer may no more be disregarded than pressure exerted in other ways. * * *"

█ Respondent seeks to justify not only Temple's remarks to Berger but also the posted announcement of August 17, 1945, on the ground that they constituted an exercise of respondent's constitutional right to freedom of speech, and in support of this contention strong reliance is placed on our decision in National Labor Relations Board v. J. L. Brandeis &- Sons, 8 Cir., 145 F.2d 556. While the Brandeis case and other recent cases[3] recognize an employer's constitutional right of free speech in a labor dispute, they further recognize the limits which an employer may not exceed under the guise of constitution-

al privilege. While he may state facts within the orbit of the dispute, express his opinion on the merits, and even express his hostility to unions or their representatives, he may not find protection in the First Amendment for utterances which amount to coercion or threats of reprisal. National Labor Relations Board v. Trojan Powder Co., 3 Cir., 135 F.2d 337, cited with approval in Thomas v. Collins, 323 U.S. 516, 538, 65 S.Ct. 315, 89 L.Ed. 430; National Labor Relations Board v. Kopman-Woracek Shoe Mfg. Co., 8 Cir., 158 F.2d 103.

█ As we said in the Brandeis case, 8 Cir., 145 F.2d at page 564:

"The right of free speech guaranteed by the constitutional amendment extends to labor matters and the dissemination of facts. Thornhill v. [State of] Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093. It is only the use of the right of free speech in labor matters under such circumstances and conditions as to coerce the will of employees that is forbidden. National Labor Relations Board v. Brown-Brockmeyer Co., supra [6 Cir., 143 F.2d 537]; Texas & N. O. R. Co. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034.

"If respondent used coercive language it may be held responsible in these proceedings notwithstanding the constitutional guaranty of the right of free speech. We have fully set forth the remarks of the officers of respondent because a consideration of the language used must determine its character. This is a question of law. The sole statutory test is interference, restraint or coercion."

The statements of Temple to Berger included threats to close the plant if the union was successful in its organization campaign and promises to "take care" of those who had voted against the union. The Board found in the notice of August 17,

---

[3] See cases cited in the Brandeis opinion, 145 F.2d at page 564. See also Thomas v. Collins, 323 U.S. 516, 537, 65 S.Ct. 315, 89 L.Ed. 430; May Department Stores v. National Labor Relations Board, 326 U.S. 376, 66 S.Ct. 203; National Labor Relations Board v. Kopman-Woracek Shoe Manufacturing Company, supra; National Labor Relations Board v. American Pearl Button Company, 8 Cir., 149 F.2d 311; National Labor Relations Board v. Montgomery-Ward Company, 8 Cir., 157 F.2d 486; National Labor Relations Board v. West Kentucky Coal Company, 6 Cir., 152 F.2d 198.

viewed in the light of the other circumstances, an implied threat of the possibility of closing the plant and of abolition of overtime work. In this connection we note that while the August 17 announcement emphasized respondent's "liberal" policy of permitting its employees to work overtime rather than employing additional help, respondent shortly thereafter, without explanation, withdrew the privilege of overtime work, and thereby demonstrated in a realistic way its power to impose economic sanctions on its employees.

■ The Board also had before it statements of respondent's attorney which might reasonably be deemed to be coercive. These remarks included implied threats to close the plant or to move it elsewhere. See National Labor Relations Board v. New Era Die Co., 3 Cir., 118 F.2d 500; National Labor Relations Board v. Asheville Hosiery Co., 4 Cir., 108 F.2d 288; Atlas Underwear Co. v. National Labor Relations Board, 6 Cir., 116 F.2d 1020. The remarks were properly before the Board and we cannot say that it erred in considering them or gave to them undue weight or emphasis.

The Board's finding of violation of Section 8(1) of the Act is further buttressed by respondent's action in granting a general pay increase to its employees without consulting the union which at the time was the duly constituted bargaining representative of respondent's production and maintenance employees. The wage announcement was couched in terms clearly calculated to undermine union prestige at the plant and constituted in effect an appeal to the employees to accept terms of employment dictated by respondent in disregard of the employees' bargaining agent. See Medo Photo Supply Corporation v. National Labor Relations Board, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007; May Department Store Co. v. National Labor Relations Board, 326 U.S. 376, 66 S.Ct. 203. In the May case, the Supreme Court said (326 U.S. loc. cit. 383, 384, 386, 66 S.Ct. loc. cit. 208):

"It is settled law that the Labor Relations Act makes it an employer's duty to bargain collectively only with the duly recognized or accredited representative of the employees. Disregard of this duty violates Sec. 8(1) of the Act. Sec. 9(a) [29 U.S.C.A. § 159(a)]. Medo Corporation v. National Labor Relations Board, 321 U.S. 678, 683, 684, 64 S.Ct. 830, 832, 833, 88 L.Ed. 1007. Any other conclusion would infringe an essential principle of collective bargaining. See J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 338, 64 S.Ct. 576, 580, 88 L.Ed. 762. Employer action to bring about changes in wage scales without consultation and negotiation with the certified representative of its employees cannot, we think, logically or realistically, be distinguished from bargaining with individuals or minorities. * * *

"We find no basis for eliminating the announcements or the publication from consideration on the ground that they were an exercise of the right of free expression, secured by the First Amendment. They are a part of the totality of Company activities and were properly received by the Board as evidence of the unilateral action of the employer. National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 348, 86 L.Ed. 348."

The record reveals that in determining that respondent violated Sec. 8(1) the Board properly considered the evidence as a whole with due regard for circumstances surrounding the various acts and conduct which led the Board to its decision. Cf.: National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 479, 62 S.Ct. 344, 86 L.Ed. 348.

## Discrimination.

■ The Board found that the discontinuance of overtime work during the latter part of August, 1945, resulted in discrimination against spinning room employees on account of union activities, and ordered respondent to make whole such employees for financial loss sustained as a result of the discrimination. With this determination we are not in agreement. We recognize the broad discretion vested by Congress in the Board to require the reimbursement of workers for loss of wages discrimi-

208

natorily imposed, and will interfere with exercise of that discretion only for the most cogent reasons. National Labor Relations Act, Sec. 10(e) (f); National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Nevada Consolidated Copper Corporation, 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 1305. But we have the right and duty to reject a conclusion of the Board which disregards or fails to give proper cognizance to uncontradicted or well established facts. National Labor Relations Board v. Laister-Kauffmann Aircraft Corporation, 8 Cir., 144 F.2d 9. The sanctions of the National Labor Relations Act are imposed for the protection of employees and not in punishment of their employer. National Labor Relations Board v. Virginia Electric & Power Co., supra. We recognize the authority of the Board to reimburse employees for financial loss caused by the employer's discrimination against them. And in this case we agree that the record before the Board justified its finding that the reason for discontinuance of overtime at respondent's mill was respondent's determination to indicate to the employees the economic sanctions that could be imposed against them, and the Board properly considered the discontinuance of overtime in determining whether respondent violated Sec. 8(1). We are not convinced by respondent's contention that it honestly believed that the employees did not desire overtime work or that such work was discontinued to relieve the burden on Manager Temple as a result of overwork. But we fail to find in respondent's action a discrimination against the individual workers to whom the Board has undertaken to require payment for un-worked overtime to be made. While a majority of spinning room employees were union members and most cardroom employees were not, the fact remains that union and non-union workers were similarly treated. The disproportionate treatment of union and non-union employees may be persuasive evidence of discrimination in violation of Sec. 8(3). National Labor Relations Board v. Wilson Line, Inc., 3 Cir., 122 F.2d 809; National Labor Relations Board v. Bachelder,

7 Cir., 120 F.2d 574. But this section does not impose an obligation to favor union employees over others. Phelps Dodge Corporation v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

When respondent's plant was placed on a 40 hour week all employees sustained correspondingly similar pay reductions. Cardroom employees continued to work overtime but in this we fail to discern discrimination, for these employees had previously worked more overtime hours than the others. The record is clear that in order to furnish material necessary to operate spinning mules 40 hours per week, it was necessary to operate the cardroom on approximately a 54 hour basis. We think the Board failed to give this salient fact proper consideration. The record convinces that to allow overtime pay to the spinning room employees for the overtime they did not work would actually result in discrimination in their favor against the other employees in the plant. We do not find that such discrimination in favor of these workers would tend to effectuate the purposes of the Act. The Act is not punitive.

### Refusal to Bargain.

On the issue of respondent's refusal to bargain with the union the Board's decision is supported by substantial evidence. The conference of October 6, 1945, was the only attempt to negotiate a collective bargaining agreement. At this conference respondent flatly refused to bargain on any major point until the closed shop demand was dropped and refused to discuss that issue in connection with the other questions. For the union to have acceded to this demand would have resulted in the union placing itself at a great disadvantage at the conference table. Respondent had a duty to bargain in good faith on the issue of a closed shop as well as on other issues, although of course it had no duty to accede to union demands or to reach an agreement with the union on the issue. Wilson & Co. v. National Labor Relations Board, 8 Cir., 115 F.2d 759, and cases cited page 763. In National Labor Relations Board v. Reed & Prince

Mfg. Co., 1 Cir., 118 F.2d 874, certiorari denied 313 U.S. 595, 61 S.Ct. 1119, 85 L.Ed. 1549, it was held that an employer's insistence on a provision in a contract with a bargaining agent, that during the period of the contract or at any future time the employees and the union would not request or demand a closed shop agreement or check-off system, warranted the National Labor Relations Board in inferring that the employer was not actuated by a genuine desire to reach an accord with the bargaining representative.

Respondent not only refused to discuss the closed shop issue and to consider other union demands unless the closed shop issue was dropped, but approximately two months later, respondent granted a general wage increase without consulting the union. This tended to show respondent's decision not to bargain collectively with the union.

In justification of its refusal to consider other union proposals until the closed shop issue was settled, respondent contends that the question of increased wages was dependent on whether the mill could remain in uninterrupted production and that if its cardroom employees were forced into the union against their will production might be interrupted. However, this possibility apparently did not occur to respondent two months later when it granted the unilateral wage increase, though the closed shop issue had not yet been settled. We fail to follow respondent's reasoning on this point, assuming, as contended, that respondent was at all times ready and willing to conduct further negotiations with the union.

In granting a general wage increase without negotiation with the union, respondent indicated its determination to deal with its employees independently rather than through their bargaining representatives. See May Stores Co. v. National Labor Relations Board, supra. Under the National Labor Relations Act respondent had the duty to bargain in good faith collectively and exclusively with the union which was the chosen representative of a majority of its employees. Wilson & Co. v. National Labor Relations Board, supra. On the record before us we cannot say

that the Board erred in holding that respondent failed to make an honest effort to discharge this obligation.

The order of the National Labor Relations Board will be modified in accordance with this opinion and as modified will be enforced.